**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1906

B-21 WINES, INC.; JUSTIN HAMMER; BOB KUNKLE; MIKE RASH; LILA RASH,

Plaintiffs – Appellants,

v.

HANK BAUER, Chair, North Carolina Alcoholic Beverage Control Commission,

Defendant – Appellee,

and

JOSHUA STEIN, Attorney General of North Carolina,

Defendant.

------------------------------

CENTER FOR ALCOHOL POLICY; NORTH CAROLINA ASSOCIATION OF ABC BOARDS; AMERICAN BEVERAGE LICENSEES; NC BEER & WINE WHOLESALERS ASSOCIATION; WINE & SPIRITS WHOLESALERS OF AMERICA, INCORPORATED,

Amici Supporting Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Frank D. Whitney, District Judge.  (3:20-cv-00099-FDW-DCK)

Argued:  March 9, 2022                    Decided:  June 1, 2022

Before WILKINSON, KING, and QUATTLEBAUM, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Quattlebaum joined. Judge Wilkinson wrote a dissenting opinion.

---

**ARGUED**: James A. Tanford, EPSTEIN COHEN SEIF AND PORTER, LLP, Bloomington, Indiana, for Appellants. Ryan Y. Park, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Robert D. Epstein, James E. Porter, EPSTEIN COHEN SEIF AND PORTER, LLP, Indianapolis, Indiana; William C. Trosch, CONRAD TROSCH & KEMMY, P.A., Charlotte, North Carolina, for Appellants. Joshua H. Stein, Attorney General, Zachary W. Ezor, Solicitor General Fellow, Jeffrey B. Welty, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. Jon Carr, JORDAN PRICE, Raleigh, North Carolina, for Amicus North Carolina Association of ABC Boards. John C. Neiman, Jr., Brandt P. Hill, MAYNARD COOPER & GALE P.C., Birmingham, Alabama, for Amici The Center for Alcohol Policy and the North Carolina Association of ABC Boards. Jo Moak, Jacob Hegeman, WINE & SPIRITS WHOLESALERS OF AMERICA, INC., Washington, D.C.; Kris Gardner, THARRINGTON SMITH LLP, Raleigh, North Carolina; Frederick R. Yarger, Teresa G. Akkara, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for Amici Wine & Spirits Wholesalers of America, Inc., American Beverage Licensees, and North Carolina Beer & Wine Wholesalers Association.

---

KING, Circuit Judge:

Plaintiffs B-21 Wines, Inc., a Florida-based wine retailer, plus its owner and three North Carolina residents, initiated this 42 U.S.C. § 1983 action in the Western District of North Carolina, challenging a North Carolina alcoholic beverage control regime as unconstitutional. More specifically, the Plaintiffs allege that North Carolina's regime, which prohibits out-of-state retailers — but not in-state retailers — from shipping wine directly to consumers in North Carolina (the "Retail Wine Importation Bar"), contravenes the Constitution's dormant Commerce Clause. The Plaintiffs sought declaratory and injunctive relief and named the Chair of the North Carolina Alcoholic Beverage Control Commission as a defendant, in his official capacity only (hereinafter, the "N.C. Commission").[1]

After entertaining competing cross-motions for summary judgment, the district court awarded summary judgment to the N.C. Commission, ruling that the Twenty-first Amendment authorizes the Retail Wine Importation Bar. *See B-21 Wines, Inc. v. Guy*, No. 3:20-cv-00099 (W.D.N.C. July 9, 2021), ECF No. 43 (the "Opinion").[2] The Plaintiffs challenge that ruling by way of this appeal. As explained herein, we are satisfied that —

---

[1] When the Plaintiffs initiated this litigation, A.D. Guy, Jr., was Chair of the N.C. Commission and was named as a defendant. During the appeal, Hank Bauer replaced Guy as Chair. We have substituted Bauer for Guy, pursuant to Federal Rule of Appellate Procedure 43(c)(2). The Plaintiffs also named the Attorney General of North Carolina as a defendant, in his official capacity. The Attorney General asserted sovereign immunity and was dismissed. That ruling is not challenged.

[2] The Opinion is published in the Federal Supplement and can be found at 548 F. Supp. 3d 555 (W.D.N.C. 2021).

even though the Retail Wine Importation Bar discriminates against interstate commerce — it is authorized by Section 2 of the Twenty-first Amendment.  In the circumstances, we affirm the district court.

I.

A.

Plaintiff B-21 Wines is a wine retailer from Florida that sells wine by way of online transactions.  B-21 Wines and its Florida resident owner, plaintiff Justin Hammer, seek to sell and ship wine to North Carolina consumers.  Plaintiffs Bob Kunkle, Mike Rash, and Lila Rash are North Carolina residents who desire to purchase wine from out-of-state retailers such as B-21 Wines, and seek to have the wine shipped directly to them.  North Carolina, however, has made it unlawful "for any person who is an out-of-state retail[er]" to ship any "alcoholic beverage" — a term that includes wine — directly to North Carolina consumers.  *See* N.C. Gen. Stat. § 18B-102.1(a).  Additionally, North Carolina prohibits its residents from "hav[ing] any alcoholic beverage mailed or shipped to [them] from outside this State."  *Id.* § 18B-109(a).

By contrast, North Carolina's in-state retailers may ship wine directly to consumers in the State.  In that regard, North Carolina generally allows those wine retailers to ship their product "in closed containers to individual purchasers inside and outside the State."  *See* N.C. Gen. Stat. § 18B-1001(4).  To ship wine directly to consumers, retailers are required to obtain permits, *id.* § 18B-304, and such permits may be issued only to retail locations owned or managed by a North Carolina resident and having in-state physical

4

premises that are made available for inspection, *id.* §§ 18B-900(a)(2), -502. Additionally, qualifying retailers must purchase their wine from an in-state wholesaler. *Id.* § 18B-1006(h).

North Carolina thus prohibits out-of-state retailers — by way of the Retail Wine Importation Bar — from shipping wine directly to the State's consumers. On the other hand, North Carolina allows its in-state retailers to do so. The constitutionality of that statutory distinction is at issue in this appeal.

### B.

The differential treatment that North Carolina applies to in-state and out-of-state retailers with respect to wine shipping is part of the Old North State's larger regime of alcoholic beverage control. Like many other states, North Carolina has decided to regulate alcoholic beverages by routing them through a system of three distinct "tiers." A typical "three-tier system" separates the producers, the wholesalers, and the retailers, consistent with the public interest aim of promoting responsible consumption of alcoholic beverages. An important feature of a typical three-tier system is "to prohibit a member of one tier from having a financial interest in a member of a higher or lower tier." *See Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1176 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 335 (2021). In North Carolina, the first tier of the three-tier system relates to the alcoholic beverage producers — such as wineries, breweries, and distilleries. *See* N.C. Gen. Stat. §§ 18B-1101, -1104, -1105. The system's second tier relates to the alcoholic beverage wholesalers, who purchase such beverages from producers and sell them to retailers. *Id.* §§ 18B-1107,

5

-1109. And the third tier is for the alcoholic beverage retailers — such as bars, restaurants, and other businesses, which sell such beverages directly to consumers. *Id.* § 18B-1001.

Most alcoholic beverages in North Carolina pass through each of the three tiers before they reach consumers. North Carolina, however, has created limited exceptions to its three-tier system. One such exception applies to a specific class of alcoholic beverage producers — that is, the wineries. North Carolina authorizes both in-state and out-of-state wineries to obtain wine-shipper permits and to ship their product directly to consumers, thus bypassing the wholesaler and retailer tiers. *See* N.C. Gen. Stat. § 18B-1001.1. But that exception applies only to the wine producers and does not pertain to the wine retailers. The wine retailers are treated differently with respect to wine shipping privileges, based on whether they are in-state or out-of-state retailers. In sum, in North Carolina, the privilege of direct wine shipping is available to in-state wine producers, out-of-state wine producers, and in-state wine retailers — but not to out-of-state wine retailers.

The basic framework of the three-tier system has been in place for the better part of a century. Multiple states have adopted the system, primarily to promote public health and prevent alcohol abuse problems caused by so-called "tied-house" saloons that existed prior to Prohibition. Back then, the alcoholic beverage producers paid to establish saloons and, in exchange, the saloonkeepers agreed to sell only their backers' alcohol and to meet strict sales quotas. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2463 & n.7 (2019). Because those producers served only as "absentee" owners, they "knew nothing and cared nothing" about the resulting social ills. *See* J.A. 281 (citing Raymond B. Fosdick & Albert L. Scott, *Toward Liquor Control* 33 (Ctr. for Alcohol Pol'y 2011)

6

(1933)).[3] The "tied-houses" thus led to widespread alcohol abuse, which caused "a greater amount of crime and misery" than "any other source." *See Crowley v. Christensen,* 137 U.S. 86, 91 (1890).

In 1908, to address the social problems brought about by the "tied-houses," North Carolina prohibited alcoholic beverage sales statewide. This was more than a decade before the Eighteenth Amendment — ratified in 1919 — imposed Prohibition and banned nationwide the manufacture, sale, and transportation of alcoholic beverages. And although Prohibition technically resolved the "tied-house" issue, it led to a myriad of other social problems. As a result, the Eighteenth Amendment was repealed only 14 years later — in 1933 — by Section 1 of the Twenty-first Amendment. To garner support for the repeal of Prohibition, the drafters of the Twenty-first Amendment included Section 2 therein, which affords every state the option of banning alcoholic beverages completely if it chooses to do so. Section 2 provides, *in haec verba*, as follows:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

*See* U.S. Const. amend. XXI, § 2.

After the Twenty-first Amendment returned the authority to regulate "intoxicating liquors" to the states, North Carolina appointed a commission in 1935 to study the issues related to alcoholic beverage control. *See A Survey of Statutory Changes in North Carolina*

---

[3] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

*in 1935*, 13 N.C. L. Rev. 355, 388 (1935).  The commission's report of 1937 advised of the need to address the "well recognized evils of the intemperate use of alcohol as a beverage," but to avoid "excessive restrictions which, however sincere, would result in defeating the desired ends." *See* J.A. 296.  To strike a balance, the commission recommended that North Carolina take over the distribution and sale of alcoholic beverages.  It also recommended that North Carolina adopt a statutory regime of alcoholic beverage control that would "promote temperance" while simultaneously "driving . . . the illicit dealer out of business." *Id.* at 305.

Implementing the commission's recommendations, the North Carolina General Assembly created in 1937 an administrative body with general supervisory powers over commerce involving alcoholic beverages — now known as the North Carolina Alcoholic Beverage Control Commission.  For a few years thereafter, all alcoholic beverage sales in North Carolina were channeled through a network of county boards.  In 1939, however, North Carolina switched from the county board system to a three-tier system of alcoholic beverage control.

North Carolina has modified and refined its three-tier system over the years, including by allowing wine producers to obtain permits to ship wine directly to consumers. The State has, however, consistently remained committed to the core of the three-tier system.  Indeed, the General Assembly has recently "reaffirm[ed] its support" of the three-tier system.  *See* Act of July 18, 2019, S.L. 2019-18, 2019 N.C. Sess. Laws 163, 163-64. In 2019, North Carolina amended its alcoholic beverage control statutes, specifying their purpose as to "limit rather than expand" commerce involving alcohol, and to maintain

8

"strict regulatory control . . . through the three-tier . . . system." *Id.* at 165-66 (codified at N.C. Gen. Stat. § 18B-100).

C.

On February 18, 2020, the Plaintiffs filed their Complaint against the N.C. Commission in this litigation, alleging, inter alia, that by prohibiting out-of-state retailers from shipping wine directly to North Carolina consumers — while at the same time permitting in-state retailers to do so — North Carolina violates the dormant Commerce Clause. The Complaint challenged three provisions of North Carolina's alcoholic beverage control regime that relate to the Retail Wine Importation Bar — specifically, sections 18B-102.1(a), -109(a), and -900(a)(2) of the North Carolina General Statutes.[4] After the district court declined to dismiss the Complaint against the Commission, the parties filed cross-motions for summary judgment. By their respective summary judgment motions, the Plaintiffs requested the court to invalidate the challenged statutory provisions, while the Commission asked the court to uphold them as constitutional under the Twenty-first Amendment. After conducting oral argument, the court filed its Opinion of July 9, 2021, resolving the litigation by denying the Plaintiffs' motion and awarding summary judgment to the Commission.

---

[4] As explained above, section 18B-102.1(a) makes it unlawful "for any person who is an out-of-state retail[er]" to ship any "alcoholic beverage" directly to North Carolina consumers. Section 18B-109(a) in turn prohibits any North Carolina resident from "hav[ing] any alcoholic beverage mailed or shipped to him from outside this State." And section 18B-900(a)(2) provides that qualifying alcohol retail locations must be owned or managed by a North Carolina resident.

9

The Opinion assessed the Retail Wine Importation Bar in light of the interplay between the dormant Commerce Clause — recognized by the Supreme Court for nearly 200 years as prohibiting discrimination by any of the states against interstate commerce — and the Twenty-first Amendment, which explicitly grants to the several states the authority to regulate "intoxicating liquors" within their borders. The Opinion recognized and explained that, for purposes of a dormant Commerce Clause challenge, state regimes that regulate alcoholic beverages are analyzed under a two-step framework. *See* Opinion 6. First, a court inquires into whether the challenged regime discriminates against interstate commerce. *Id.* at 7. If that inquiry is answered in the affirmative, the court then "ask[s] whether the challenged [regime] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* (internal quotation marks omitted).

After making the initial inquiry, the district court concluded that North Carolina's challenged statutory provisions facially discriminate against out-of-state wine retailers. *See* Opinion 9. And in assessing whether the Retail Wine Importation Bar could be justified as "a public health or safety measure or on some other legitimate nonprotectionist ground," the court recognized that North Carolina has an important interest in maintaining its three-tier system of alcoholic beverage control. *Id.* at 8-9. That system, the court explained, is "inherently tied to public health and safety measures the Twenty-first Amendment was passed to promote." *Id.* at 8.

The Opinion also recognized that North Carolina's prohibition on direct wine shipping by out-of-state retailers to the State's consumers is an essential feature of its three-tier system. *See* Opinion 9. As the district court explained, an alcoholic beverage control

10

regime that allows out-of-state wine retailers to ship directly to North Carolina consumers would effectively enable those retailers to bypass the State's three-tier system. *Id.* at 11. The Opinion thus concluded that the Plaintiffs' challenge to the Retail Wine Importation Bar presented

> a choice between virtually eliminating North Carolina's three-tier system, which the Supreme Court and multiple Courts of Appeals have determined is unquestionably legitimate, and maintaining the status quo.

*Id.* Resolving that choice, the district court rejected the Plaintiffs' challenge and upheld the Retail Wine Importation Bar as constitutional. *Id.* The Plaintiffs have timely appealed from the court's judgment, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

At the root of the parties' disagreement lies the question of the proper balance between, on the one hand, North Carolina's constitutional power under the Twenty-first Amendment to regulate alcoholic beverages within its boundaries and, on the other, the dormant Commerce Clause's prohibition on discrimination by a state against interstate commerce. The Plaintiffs' contention on appeal is that the district court struck an erroneous balance, affording North Carolina's regulatory authority too much weight. The N.C. Commission, for its part, agrees with the district court, maintaining that the differential treatment of in-state and out-of-state wine retailers at issue in these proceedings is constitutionally authorized.

We review de novo a district court's disposition of cross-motions for summary judgment. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). As we have

11

explained, "when cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011). Pursuant to that standard, "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *See Lawson v. Union Cnty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). We also review de novo a district court's ruling with respect to the constitutionality of a state statute. *See Miller v. Brown*, 503 F.3d 360, 364 (4th Cir. 2007).

III.

The constitutional provisions at center stage in this appeal are the Commerce Clause — contained in Article I, Section 8, Clause 3 of the Constitution and ratified late in the Eighteenth Century — and the Twenty-first Amendment, specifically Section 2 thereof, which was ratified about 145 years thereafter. The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." *See* U.S. Const. art. I, § 8, cl. 3. "Although the Clause is framed as a positive grant of power to Congress," the Supreme Court has recognized that the Clause "also prohibits state laws that unduly restrict interstate commerce." *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019) (internal quotation marks omitted). Important here, the "negative" or "dormant" aspect of the Commerce Clause prohibits the several states from "adopting protectionist

12

measures and thus preserves a national market for goods and services." *Id.* (internal quotation marks omitted). Ordinarily, a state statute that discriminates against interstate commerce is evaluated under a test that is akin to strict scrutiny review, requiring invalidation unless the state demonstrates "both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." *See Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 543 (4th Cir. 2013) (internal quotation marks omitted). But when a challenged statutory regime regulates alcoholic beverages — thus implicating the Twenty-first Amendment — the standard of review is different.

Section 2 of the Twenty-first Amendment explicitly grants to each of the states a broad power to regulate "intoxicating liquors," i.e., wine and other alcoholic beverages, within their respective boundaries. The Supreme Court's initial assessment of Section 2, made by Justice Brandeis in 1936, was that its broad language accorded plenary authority to the several states to regulate alcoholic beverages, including the power to discriminate against out-of-state alcohol interests. *See State Bd. of Equalization v. Young's Market Co.*, 299 U.S. 59, 62 (1936). But more recently, in a somewhat fractured decision in 2005, the Court resolved that Section 2 "does not abrogate Congress' Commerce Clause powers with regard to liquor." *See Granholm v. Heald*, 544 U.S. 460, 487 (2005). In fact, the Court emphasized that "state regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause." *Id.*

Nevertheless, because of the unique constitutional authority accorded to the states under Section 2 to regulate alcoholic beverages — the only consumer product actually

13

mentioned in the Constitution — the Supreme Court confirmed that the Twenty-first Amendment affords a state "virtually complete control" over the distribution of alcoholic beverages within its borders. *See Granholm*, 544 U.S. at 488 (internal quotation marks omitted). Thus, a dormant Commerce Clause challenge to a state's alcoholic beverage control statutes requires that the reviewing court "engage in a different inquiry" than it would utilize for challenges to state statutes involving other commercial products. *See Tenn. Wine*, 139 S. Ct. at 2474.

The Supreme Court recently enunciated, in its 2019 *Tennessee Wine* decision, a two-step framework for assessing alcoholic beverage control laws that are challenged under the dormant Commerce Clause. First, a court must ask whether the challenged regime discriminates against interstate commerce. *See Tenn. Wine*, 139 S. Ct. at 2474. If the answer to that inquiry is no, the court's assessment ends and the challenged regime is constitutional. On the other hand, if the inquiry is answered in the affirmative, the court proceeds to the second step and assesses "whether the challenged [regime] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id*. To properly assess and dispose of this appeal, we will — as the district court did — address those two steps in turn.

## A.

In evaluating whether North Carolina's Retail Wine Importation Bar discriminates against interstate commerce, the district court concluded that it did not need to "go into an extensive dormant Commerce Clause analysis" because the challenged statutes are "discriminatory on their face." *See* Opinion 9. On appeal, the Plaintiffs have limited their

14

challenge to two provisions:  sections 18B-102.1(a) and -109(a) of the North Carolina General Statutes.  The first of those provisions — section 18B-102.1(a) — prohibits out-of-state retailers from shipping wine to consumers in North Carolina.  The second provision — section 18B-109(a) — makes it unlawful for North Carolina consumers to have wine shipped directly to them from outside the State.

The Supreme Court has defined impermissible discrimination for purposes of the dormant Commerce Clause as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *See Granholm*, 544 U.S. at 472 (internal quotation marks omitted).  We therefore assess whether sections 18B-102.1(a) and -109(a) — as core provisions of the Retail Wine Importation Bar and part of North Carolina's alcoholic beverage control regime — treat in-state and out-of-state wine retailers differently and in a manner that unconstitutionally benefits the former and burdens the latter.

When construing a statute, we must start with the text thereof.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004).  The language of section 18B-102.1(a) — which makes it "unlawful for any person who is an out-of-state retail[er] . . . to ship or cause to be shipped any alcoholic beverage directly to any North Carolina resident" — is readily suspect.  That provision singles out a specific group — out-of-state retailers — and prohibits that group from shipping alcoholic beverages directly to consumers in North Carolina.  When assessed in conjunction with section 18B-1001(4) — which allows in-state retailers to ship wine "in closed containers to individual purchasers inside and outside the State" — the discriminatory nature of section 18B-102.1(a) is obvious.  This discrimination against

15

interstate commerce is emphasized by section 18B-109(a), which, for its part, prohibits any North Carolina resident from "hav[ing] any alcoholic beverage mailed or shipped to him from outside this State."[5]

On appeal, the N.C. Commission concedes that section 18B-102.1(a) targets out-of-state retailers for discriminatory treatment. The Commission nevertheless maintains that section 18B-102.1(a) is not discriminatory "in the relevant sense," in that "the kind of discrimination targeted by the dormant Commerce Clause is not present here." *See* Br. of Appellee 42, 45. The Commission thus argues that section 18B-102.1(a) "affords no tangible benefit to in-state retailers" because section 18B-109(a) generally prohibits North Carolina consumers from having any alcoholic beverages shipped to them from outside the State, no matter whether the sender is an out-of-state retailer or an in-state retailer sending alcohol from an out-of-state warehouse. *Id.* at 45. That contention by the Commission, however, ignores those North Carolina retailers who ship wine from within the State. Such in-state retailers have the privilege of shipping wine directly to consumers, unlike their out-of-state counterparts shipping from outside the State. And that privilege benefits North Carolina retailers by broadening the manner in which they can do business. Put succinctly,

---

[5] We recognize that out-of-state wine retailers can obtain a permit to ship their product to North Carolina residents, provided, inter alia, that those retailers are managed or owned by a North Carolina resident, have in-state premises, and buy their product from an in-state wholesaler. But that prospect does not eliminate the statutorily mandated differential treatment described above. As the Supreme Court ruled in its *Granholm* decision in 2005, New York discriminated against out-of-state wineries by allowing only in-state wineries to ship wine directly to consumers, even though out-of-state wineries could also do so if they established a distribution operation in New York. *See Granholm*, 544 U.S. at 474-75.

we are satisfied that sections 18B-102.1(a) and -109(a), as core provisions of the Retail Wine Importation Bar and part of North Carolina's alcoholic beverage control regime, discriminate against interstate commerce by allowing in-state retailers to ship their wine directly to North Carolina consumers, while at the same time prohibiting out-of-state wine retailers from doing the same.

## B.

Turning to the second and most difficult step of the *Tennessee Wine* framework — whether the Retail Wine Importation Bar is justified as "a public health or safety measure or on some other legitimate nonprotectionist ground" — the district court concluded that the Bar was so justified. On appeal, the Plaintiffs challenge that ruling, maintaining that the court erred in two principal respects: first, by applying an erroneously lenient standard; and second, in ruling that the Bar was justified.

## 1.

We will first evaluate the Plaintiffs' contention that the district court erred by applying an erroneously lenient standard in assessing whether North Carolina's Retail Wine Importation Bar was justified. Addressing step two of the *Tennessee Wine* framework, the Opinion inquired whether the Bar was "justified as a public health or safety measure or on some other legitimate nonprotectionist ground," drawing that language directly from the Supreme Court's *Tennessee Wine* decision. *See* Opinion 7-8 (internal quotation marks omitted). In *Tennessee Wine*, the Court upheld a dormant Commerce Clause challenge to Tennessee's two-year residency requirement for individuals seeking initial retail license. *See* 139 S. Ct. at 2457. In applying the framework "dictated by

17

[Section 2's] history and our precedents," the Court, after concluding at step one of its analysis that the Tennessee statute facially discriminated against interstate commerce, assessed, at step two, whether the statute was "justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id*. at 2474.

The Plaintiffs nevertheless contend on appeal that, instead of asking whether the discriminatory treatment by North Carolina is "justified as a public health or safety measure or on some other legitimate nonprotectionist ground," the district court should have assessed — and we should now assess — whether such treatment advances "an important regulatory interest that could not be furthered by reasonable nondiscriminatory alternatives." *See* Br. of Appellants 17.[6] In arguing for a different standard of review that is similar to strict scrutiny, the Plaintiffs rely in part on the *Tennessee Wine* decision, where the Supreme Court conducted a limited inquiry into the possible existence of nondiscriminatory alternatives. *See* 139 S. Ct. at 2474. But that inquiry was not central to the *Tennessee Wine* analysis, which was made pursuant to the two specified steps of the Court's framework.

---

[6] We pause to observe that the Plaintiffs are inconsistent in several respects in how they phrase the inquiry they urge us to conduct in this appeal. Instead of "an important regulatory interest," they sometimes suggest that we look for "a core concern of § 2," "an important purpose," "a legitimate non-protectionist purpose," or "a legitimate local purpose." *See* Br. of Appellants 14, 32, 35, 46. Each of those options, however, are similar to the "legitimate local purpose" terminology used in the ordinary dormant Commerce Clause analysis. *See, e.g.*, *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 543 (4th Cir. 2013).

The Plaintiffs additionally rely on the *Granholm* decision, which preceded *Tennessee Wine* by about 14 years, to support their argument for a more lenient standard. In *Granholm*, the Supreme Court struck down alcoholic beverage control regimes in Michigan and New York that allowed in-state wine producers to bypass three-tier systems and ship wine directly to consumers, but prohibited out-of-state wine producers from doing the same. *See Granholm*, 544 U.S. at 466. As part of its analysis, the *Granholm* Court inquired into whether the challenged statutory regimes "advance[d] a legitimate local purpose that [could not] be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 489 (internal quotation marks omitted). But the existence of a "legitimate local purpose" and the availability of "nondiscriminatory alternatives" were discussed by the Court only after it had already concluded that the discriminatory regimes contravened the dormant Commerce Clause and were not saved by the Twenty-first Amendment. *Id.* Here, by contrast, the district court ruled that the Retail Wine Importation Bar was authorized by the Twenty-first Amendment. And the Supreme Court's "nondiscriminatory alternatives" language relied on by the Plaintiffs was drawn from the Court's 1988 decision in *New Energy Co. of Indiana v. Limbach*, where the Twenty-first Amendment was not even implicated. *See* 486 U.S. 269, 278 (1988). As a result, the ordinary dormant Commerce Clause analysis was applied in that case, triggering a standard that was akin to strict scrutiny. In making that reference, the *Granholm* Court was explaining that the discriminatory regimes in Michigan and New York, which were not authorized by the Twenty-first Amendment, also failed the ordinary dormant Commerce Clause test.

19

Finally, our *Beskind v. Easley* decision that the Plaintiffs invoke similarily offers no support for their position here. *See* 325 F.3d 506 (4th Cir. 2003). In *Beskind*, we struck down a North Carolina alcoholic beverage control regime prohibiting out-of-state wineries from shipping wine to consumers when in-state wineries were allowed to do so — a similar ruling to that of the Supreme Court in *Granholm* two years thereafter. *Id.* at 509. Although *Beskind* preceded both *Granholm* and *Tennessee Wine,* its reasoning is entirely consistent with those decisions. *Beskind* could not have applied the precise language of *Tennessee Wine*, but the solid analysis made by Judge Niemeyer properly centered, first, on whether the challenged regime discriminated against interstate commerce, and then on whether the discriminatory regime was saved by the Twenty-first Amendment. *Id.* at 513-17.

The Plaintiffs concede on appeal that, when a statute regulating products other than alcoholic beverages is challenged, the ordinary dormant Commerce Clause analysis applies, triggering "a variant of strict scrutiny" and requiring invalidation of the discriminatory statute "unless the state demonstrates both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." *See* Br. of Appellants 19-20 (internal quotation marks omitted). And they also recognize that "the Twenty-first Amendment gave states greater regulatory authority over alcoholic beverages than they have over other products." *Id.* at 20. Based on those two correct observations, a less demanding standard of review must necessarily apply to an alcoholic beverage control regime than to regulations involving other products. Put most simply, applying the same stringent test to an alcoholic beverage control regime would undermine Section 2 of the Twenty-first Amendment.

20

Our analysis of the applicable precedents compels us to conclude that, where a challenged alcoholic beverage control regime discriminates against interstate commerce, the proper follow-up inquiry is whether that regime can nevertheless be justified "as a public health or safety measure or on some other legitimate nonprotectionist ground." *See Tenn. Wine*, 139 S. Ct. at 2474. Although consideration of nondiscriminatory alternatives could have some relevance to that inquiry, it does not transform the applicable framework into the test that ordinarily applies to a dormant Commerce Clause challenge when the Twenty-first Amendment is not implicated.

2.

Finally, we turn to the dispositive issue in this appeal — whether the Retail Wine Importation Bar is justified under the Twenty-first Amendment as a public health or safety measure or on some other legitimate nonprotectionist ground. As the district court explained, a state's interest in preserving its three-tier system for alcohol distribution can itself constitute "a legitimate nonprotectionist ground inherently tied to public health and safety measures the Twenty-First Amendment was passed to promote." *See* Opinion 8. Its Opinion thus focused on whether North Carolina's discriminatory treatment of out-of-state wine retailers is essential to the preservation of the State's three-tier system. Concluding that such treatment was essential to the preservation goal, the court rejected the Plaintiffs' contentions. The Plaintiffs, however, maintain on appeal that North Carolina has effectively abandoned its three-tier system. And they argue that, even if North Carolina yet maintains a three-tier system, its preservation is not a sufficient justification for the discriminatory aspect thereof.

21

a.

We will first assess the Plaintiffs' contention that North Carolina has abandoned its three-tier system. They maintain that, because North Carolina allows wineries — that is, wine producers — to sell their products directly to consumers, thus bypassing the separate wholesaler and retailer tiers, the State no longer has a three-tier system of alcoholic beverage control.

As the N.C. Commission emphasizes, however, the Twenty-first Amendment is not an either-or proposition. Rather, it "gives each State leeway in choosing the alcohol-related public health and safety measures that its citizens find desirable." *See Tenn. Wine*, 139 S. Ct. at 2457. Put simply, there is no single "one size fits all" three-tier system that a state must either adhere to or abandon entirely. North Carolina has decided that its three-tier system can tolerate a limited exception for in-state and out-of-state wine producers, allowing them to sell wine directly to consumers. And that exception is within North Carolina's constitutional power to create.

That North Carolina has preserved its three-tier system for distribution of alcoholic beverages is also supported by our precedent. In *Beskind*, we reviewed and struck down North Carolina statutes that authorized in-state wineries to bypass the State's three-tier system and sell directly to consumers, but prohibited out-of-state wineries from doing the same. *See* 325 F.3d at 509. Notwithstanding the exception for in-state wineries, *Beskind* recognized that North Carolina has adopted the "familiar three-tiered" system of alcohol distribution, and that it "prohibit[s] the importation of wine . . . except through [its] highly regulated three-tiered structure." *Id.* at 509-10. There was no indication in *Beskind* that

22

the flawed exception for in-state wineries meant that North Carolina no longer used a three-tier system for alcohol distribution. And we have no reason to rule today that the limited statutory exception made available by North Carolina to in-state and out-of-state wineries means that the State has abandoned its three-tier system.[7]

b.

We thus turn to the final inquiry of whether the Retail Wine Importation Bar is justified as a public health or safety measure or on some other legitimate nonprotectionist ground. In resolving that inquiry, the district court concluded that North Carolina's interest in preserving its three-tier system is itself a legitimate nonprotectionist ground that constitutes a sufficient justification. As explained below, and having reviewed de novo the relevant precedents and the contentions of the parties, we agree with that ruling.

The Supreme Court has recognized that the several states, in the exercise of their constitutional authority under the Twenty-first Amendment, are entitled to create and operate three-tier alcoholic beverage control systems. *See Granholm*, 544 U.S. at 489. Indeed, the Court has specifically described the three-tier system as "unquestionably legitimate." *Id.* (internal quotations marks omitted). The Court has also emphasized that "[s]urely, if § 2 granted States the power to discriminate in the field of alcohol regulation, that power would be at its apex when it comes to regulating the activity to which the provision expressly refers" — the importation and transportation for delivery of alcoholic

---

[7] We readily reject the Plaintiffs' effort to recast the relevant inquiry as being whether North Carolina has abandoned the three-tier system with respect to wine. The Plaintiffs have offered no legal support for that proposition, and we have identified none.

23

beverages. *See Tenn. Wine*, 139 S. Ct. at 2471. The three-tier system — the regime that limits the importation of alcoholic beverages by requiring that they flow first from manufacturers to in-state wholesalers, then to in-state retailers, and only thereafter to consumers — by its nature discriminates to some extent against interstate commerce. The only question about its viability in the context of this appeal relates to the extent such discrimination is constitutionally permissible.

Despite its unambiguous approval of the three-tier system, the Supreme Court explained in *Tennessee Wine* that it did not previously suggest "that § 2 sanctions every discriminatory feature that a State may incorporate into its three-tiered scheme." *See* 139 S. Ct. at 2471. Instead, only those discriminatory requirements that are essential features of the three-tier system are authorized by the Twenty-first Amendment. *Id*. at 2471; *see also North Dakota v. United States*, 495 U.S 423, 432 (1990) (plurality opinion). The district court's focus on whether the Retail Wine Importation Bar is an essential feature of North Carolina's three-tier system was therefore appropriate.[8]

---

[8] We acknowledge the competing contentions of the parties with respect to whether North Carolina's three-tier system actually meets the objectives it was designed to achieve — such as promotion of safe alcohol consumption and reduction of risks associated with alcohol abuse. For their part, the Plaintiffs contend that the N.C. Commission failed to provide "concrete evidence" that North Carolina's restriction on direct wine shipping to consumers by out-of-state retailers "actually promotes public health or safety." *See Tenn. Wine,* 139 S. Ct. at 2474. But in *Tennessee Wine*, the Supreme Court only referenced that requirement in the context of a statutory provision that was not an essential feature of a three-tier system. *Id*. at 2471. When, as here, an essential feature of a state's three-tier system is challenged, a court's role is more limited and does not entail an examination of the effectiveness of the three-tier system.

24

We emphasize that the Retail Wine Importation Bar directly implicates the provisions of Section 2 of the Twenty-first Amendment. To slightly recast Section 2 to precisely reflect the facts underlying this dispute, it reads as follows:

> The transportation or importation into [North Carolina] for delivery . . . therein of [wine], in violation of the laws [of North Carolina], is hereby prohibited.

*See* U.S. Const. amend. XXI, § 2. The "transportation or importation" of wine "for delivery" into North Carolina is thus specified in Section 2, and North Carolina's constitutional power to enact restrictions such as the Bar is therefore "at its apex." *See Tenn. Wine*, 139 S. Ct. at 2471. Indeed, the Supreme Court has confirmed that the several states possess "virtually complete control" over the distribution of alcoholic beverages — including wine — within their borders. *See Granholm*, 544 U.S. at 488 (internal quotation marks omitted).

In making our assessment of whether North Carolina's differential treatment of the in-state and out-of-state retailers is essential to its three-tier system, the *Tennessee Wine* decision is highly instructive. The Supreme Court recognized therein that Tennessee's durational-residency requirement for retailers was not an essential feature of Tennessee's three-tier system. *See Tenn. Wine*, 139 S. Ct. at 2471-72. As the Court explained, such a requirement was not imposed in many other states and it did not flow from the basic three-tier system of separating producers, wholesalers, and retailers. *Id.*

Unlike the discriminatory licensing requirement for retailers that the Supreme Court reviewed in *Tennessee Wine*, the Retail Wine Importation Bar is an integral part of North Carolina's three-tier system. To begin with, the Bar directly relates to North Carolina's

25

ability to separate producers, wholesalers, and retailers. The Old North State requires that nearly all alcoholic beverages pass through each of the three tiers before being sold to consumers. And the direct shipping of alcoholic beverages to North Carolina consumers by out-of-state retailers would completely exempt those out-of-state retailers from the three-tier requirement. That would open the North Carolina wine market to less regulated wine, undermining the State's three-tier system and the established public interest of safe alcohol consumption that it promotes. As one of our sister circuits recently observed in similar circumstances, the opening of a state's wine market to retail wine shipments from outside the State "necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all." *See Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 872 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1049 (2021). Eliminating the role of North Carolina's wholesalers in this way would create what the court of appeals in *Whitmer* appropriately called "a sizeable hole" in the State's three-tier system. *Id.* And when such direct wine shipping is authorized, "the least regulated (and thus the cheapest) alcohol will win." *Id.*[9]

---

[9] We observe that *Whitmer* is one of two recent court of appeals decisions that assessed challenges to regimes very similar to the Retail Wine Importation Bar post-*Tennessee Wine*. Both decisions upheld the constitutionality of such regimes under the Twenty-first Amendment. *See Whitmer*, 956 F.3d at 867 (upholding Michigan's alcoholic beverage control regime that permitted in-state retailers to offer at-home deliveries while denying that option to out-of-state retailers); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1175, 1184 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 335 (2021) (upholding Missouri's alcoholic beverage control regime that barred out-of-state wine retailers — but not in-state wine retailers — from shipping directly to Missouri consumers).

Furthermore, the direct-shipping option that in-state retailers enjoy in North Carolina is simply another way for them to sell wine to North Carolina consumers. *See Whitmer*, 956 F.3d at 873. As we recognized in *Brooks v. Vassar* several years ago, a challenge to a Virginia statute that permitted only in-state retailers to sell alcoholic beverages to consumers was "nothing different than an argument challenging the three-tier system itself." *See* 462 F.3d 341, 352 (4th Cir. 2006). That challenge was foreclosed by the *Granholm* decision, which described the three-tier system as "unquestionably legitimate." *Id.* (internal quotation marks omitted). And although the statutory authorization to sell alcoholic beverages to in-state consumers is not identical to the privilege to sell *and* ship them to such consumers, the privilege of shipping alcohol is closely intertwined with the privilege of selling it. In these circumstances, the differential treatment with respect to wine shipping by retailers is an essential aspect of North Carolina's three-tier system.[10]

Finally, we emphasize that our ruling today is consistent with the Supreme Court's *Granholm* decision and with our decision in *Beskind*. The challenged regimes underlying those disputes allowed in-state wine producers — not wine retailers — to ship wine directly to consumers, but prohibited out-of-state wine producers from doing the same. *See*

---

[10] We also reject the Plaintiffs' contention that reasonable nondiscriminatory alternatives are available to North Carolina and are required to be used. As the district court observed, the Plaintiffs' challenge presents a choice between "virtually eliminating North Carolina's three-tier system . . . and maintaining the status quo." *See* Opinion 11. We find no basis to disagree with that observation. There is no way for North Carolina to effectively maintain its three-tier system while allowing out-of-state retailers to bypass the system completely and ship wine directly to North Carolina consumers.

27

*Granholm*, 544 U.S. at 466; *Beskind*, 325 F.3d at 509. Those regimes were struck down as unconstitutional because they allowed only in-state wine producers to bypass the statutory three-tier system of alcohol distribution and ship directly to consumers. *Granholm*, 544 U.S. at 474, 493; *Beskind*, 325 F.3d at 509. By contrast, the Retail Wine Importation Bar simply assures that all wine sold to North Carolina consumers by retailers goes through the State's three-tier system.

## C.

Put simply, our analysis of North Carolina's Retail Wine Importation Bar under the *Tennessee Wine* framework leads us to conclude that, although the Bar discriminates against interstate commerce, it is nevertheless justified on the legitimate nonprotectionist ground of preserving North Carolina's three-tier system. We therefore arrive at the same conclusion reached by our colleagues in the Sixth and Eighth Circuits when they faced similar situations. *See Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 867 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1049 (2021); *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1175, 1184 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 335 (2021). At bottom, we rule that North Carolina acted within its constitutional authority — granted by Section 2 of the Twenty-first Amendment — in adopting the Retail Wine Importation Bar and prohibiting out-of-state retailers from shipping wine directly to consumers.

IV.

Pursuant to the foregoing, we reject the Plaintiffs' appellate contentions and affirm the judgment of the district court.

*AFFIRMED*

WILKINSON, Circuit Judge, dissenting:

By holding that North Carolina may flatly discriminate against out-of-state interests in its alcohol regulations, the majority has forsaken the commercial unity that makes this nation one. To be sure, in the post-Prohibition world the Twenty-first Amendment grants North Carolina considerable power over alcohol to promote temperance and public health. But some of what the Twenty-First Amendment appears to give, the Commerce Clause takes away. Just a few terms ago, the Supreme Court unequivocally reiterated that even alcohol regulations may not discriminate in violation of the dormant Commerce Clause, and it invalidated a law that disfavored out-of-state liquor retailers. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462 (2019). North Carolina's law does just that. Because each of North Carolina's undeniably legitimate Twenty-first Amendment interests could readily be furthered in a nondiscriminatory way, I respectfully dissent.

I.

The briefest description of the North Carolina law lays bare a Commerce Clause problem. North Carolina allows in-state retailers to ship wine directly to consumers. N.C. Gen. Stat. §§ 18B-900(a)(2), -1001(4). Out-of-state retailers, under pain of criminal law, cannot do the same. *Id.* § 18B-102.1.

This law is a textbook example of a dormant Commerce Clause violation. The Commerce Clause states that "Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the

30

interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). This so-called dormant Commerce Clause is understood to "prohibit[] economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988).

And for good reason. Previously, under the Articles of Confederation, each state had free reign to "pursue a system of commercial policy peculiar to itself" and implement "regulations of trade" in an "endeavor to secure exclusive benefits to their own citizens." The Federalist No. 7, at 62–63 (C. Rossiter ed. 1961) (A. Hamilton). The resulting trade barriers were "expensive," "vexatious," and "destructive of the general harmony." Madison, Vices of the Political System of the United States, *in* 2 Writings of James Madison 363 (G. Hunt ed. 1901); *see also* The Federalist No. 22, p. 144–45 (A. Hamilton) (describing the "animosity and discord" caused by "injurious impediments to the intercourse between the different parts of the Confederacy"); The Federalist No. 42, p. 267–68 (J. Madison) (describing how such regulations "would nourish unceasing animosities" among states). As one historian put it, "Interference with the arteries of commerce was cutting off the very life-blood of the nation." M. Farrand, The Framing of the Constitution of the United States 7 (1913). The new Constitution, by nationalizing the power to regulate interstate commerce, sought to avoid these ills. *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979); *Granholm v. Heald*, 544 U.S. 460, 472 (2005).

Thus, "[t]he principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS Corp. v. Dynamics Corp. of Am.*, 481

31

U.S. 69, 87 (1987). A statute is discriminatory if it imposes "differential treatment [on] in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99. While a law that "regulates evenhandedly and only indirectly affects interstate commerce" is subject to a balancing test, a law that "discriminates facially, in its practical effect, or in its purpose" is "virtually *per se*" invalid. *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996) (quotation marks omitted); *see also Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 152 (4th Cir. 2016). Courts have found facially discriminatory statutes—those that speak in unmistakably geographical terms—particularly easy to reject under the dormant Commerce Clause. *See, e.g.*, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 618, 626–27 (1978) (invalidating state law prohibiting importation of waste from "outside the territorial limits of the State"); *Hughes*, 441 U.S. at 336–37 (invalidating state law prohibiting exportation of minnows "out of the State for purposes of sale").[1]

North Carolina's law quite plainly discriminates on its face. The very words of the law distinguish between what in-state and out-of-state retailers may do. As noted earlier, a licensed in-state retailer may ship wine directly to North Carolina consumers, N.C. Gen. Stat. §§ 18B-900(a)(2), -1001(4), yet it is a felony offense for an "out-of-state retail[er]" to

---

[1] To be sure, not every facial distinction between in- and out-of-state interests violates the dormant Commerce Clause. For instance, most state university systems charge higher tuition for out-of-state students, as they are permitted to do by the market participant exception, *see Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 496 n.9 (10th Cir. 1998) (citing *Reeves, Inc. v. Stake*, 447 U.S. 429, 436–39 (1980)), and states have also been allowed to implement facially-discriminatory quarantine laws for health and safety purposes, *see City of Philadelphia v. New Jersey*, 437 U.S. 617, 628–29 (1978).

do the same. *Id.* § 18B-102.1. As a result—and as reiterated by a separate statutory provision for good measure—a North Carolina consumer may receive retail wine only from another North Carolinian; he may not "have [it] mailed or shipped to him from outside th[e] State." *Id.* § 18B-109. I cannot think of a more starkly discriminatory scheme.

Because the discrimination is manifest in the statute's very text, there is no need to speculate about the law's purpose or effects. Those are much thornier questions, as "once one gets beyond facial discrimination [the] negative-Commerce-Clause jurisprudence becomes (and long has been) a quagmire." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 210 (1994) (Scalia, J., concurring in the judgment) (quotation marks omitted). For the simple reality of geography can place all sorts of *de facto* burdens on commerce—being in-state may bring with it certain inherent advantages, such as proximity to one's customer base—and there may be perfectly benign regulations that have adverse ripple effects on out-of-state commercial activity. *See Colon Health Ctrs.*, 813 F.3d at 159 (warning of the risk of "judicial interference with legislation touching no end of subject matters" under a wide view of the dormant Commerce Clause). But this case is straightforward. It does not require us to test the perimeters of the dormant Commerce Clause. This law lies in the prohibition's crosshairs. It is a *de jure* imposition of differential treatment, a legal codification of advantages. By "depriv[ing] citizens of their right to have access to the markets of other States on equal terms," this law strikes at the very evils the "Commerce Clause w[as] designed to avoid." *Granholm*, 544 U.S. at 473.

North Carolina would have us believe that the laws are not *really* discriminatory, for all retailers with licenses may ship directly to consumers on the same terms, and out-

of-staters can obtain a license by setting up shop in North Carolina and designating a resident to manage the business. But, as the majority correctly recognizes, it is misguided to think that recasting the discrimination absolves it. *See Granholm*, 544 U.S. at 474. Any way you slice it, the scheme still "grants in-state [retailers] access to the State's consumers on preferential terms." *Id.* As long as they have relevant licenses, in-state retailers "can ship directly to consumers" from their stores. *Id.* But "[o]ut-of-state [retailers] must open a branch office and warehouse in [North Carolina]" and designate an in-state resident to manage it, "additional steps that drive up the cost of their wine." *Id.* at 474–75. Such an "in-state presence requirement runs contrary to our admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Id.* at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)).

Of course, it is always easier for state legislatures to follow the course of least resistance, appeasing the in-state crowd. And I understand the fondness for home cooking. But the fact remains that it is impermissible under the dormant Commerce Clause for North Carolina to "plainly favor[]" North Carolina retailers over those of any other state. *Tenn. Wine*, 139 S. Ct. at 2462. "Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits." *W. Lynn Creamery*, 512 U.S. at 205. "This rule is essential to the foundations of the Union": North Carolina simply may not prohibit out-of-state retailers from accessing its market on equal terms. *Granholm*, 544 U.S. at 472.

34

II.

Were this any other commodity, North Carolina's facially discriminatory scheme would instantly be ruled invalid. *Granholm*, 544 U.S. at 476; *Tenn. Wine*, 139 S. Ct. at 2462. But since it deals with alcohol, the Twenty-first Amendment swoops into play, and the majority holds that it lifts the statute to firm ground. It does no such thing.

There is no question that states have wide latitude in regulating the sale and consumption of alcohol. Part of the compromise to repeal national Prohibition, after all, was to lodge that regulatory power instead with each individual state, resulting in § 2 of the Twenty-first Amendment: "The transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. States may set the age at which residents can purchase and consume alcohol, *e.g.*, N.C. Gen. Stat. § 18B-300, and determine qualifications for producer, wholesaler, and retailer permits, *e.g.*, N.C. Gen. Stat. § 18B-900. They may institute and police the system for distributing alcohol. *E.g.*, N.C. Gen. Stat. §§ 18B-1000 to -1300. They may, as many do, establish a three-tiered system, in which alcohol must flow through a licensed producer, wholesaler, and retailer before reaching the consumer. *Granholm*, 544 U.S. at 489. They may even establish a state-run monopoly for distribution or outlaw alcohol altogether within their borders. *Id*. I do not dispute that North Carolina, like any state, has the clear authority to do all these things.

What I do dispute is that it may do these things in a way that starkly favors in-state interests. The Supreme Court has repeatedly confirmed that it may not: states' § 2 power to regulate alcohol remains "limited by the nondiscrimination principle of the [dormant]

35

Commerce Clause." *Granholm*, 544 U.S. at 487; *see also Tenn. Wine*, 139 S. Ct. at 2470. If, for example, a state banned domestic alcohol, it could also ban imported alcohol. But its ability to do so remained subject to the proviso "that the States treated in-state and out-of-state liquor on the same terms." *Granholm*, 544 U.S. at 481. In no way did either the Act or § 2 displace the nondiscrimination principle of the Commerce Clause. *Id.* at 484–85.

In sum, § 2 of the Twenty-first Amendment authorized evenhanded, nondiscriminatory laws for "maintain[ing] an effective and uniform system for controlling liquor." *Id.* It did "not . . . give States a free hand to restrict the importation of alcohol for purely protectionist purposes." *Tenn. Wine*, 139 S. Ct. at 2469. Accordingly, the Court has consistently "invalidated state alcohol laws aimed at giving a competitive advantage to in-state business." *Id.* at 2470 (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 274–76 (1984) (invalidating tax exemption favoring in-state alcohol producers); *Healy v. Beer Inst.*, 491 U.S. 324, 340–41 (1989) (invalidating price regulation on out-of-state beer distributors); *Granholm*, 544 U.S. at 487–93 (invalidating direct-shipment law favoring in-state wineries)). I therefore have no trouble concluding that the Twenty-first Amendment does not authorize North Carolina's discriminatory treatment of in-state and out-of-state retailers.

## A.

There is no need to bake this cake from scratch. The Supreme Court has twice considered state laws that were, in all relevant respects, indistinguishable from the one at

36

issue here. And both times it held they were not authorized by the Twenty-first Amendment. I am startled that the majority would not follow this precedent.

At issue in *Granholm v. Heald* were New York and Michigan laws permitting in-state wineries, but not out-of-state wineries, to ship wine directly to consumers. 544 U.S. at 465–66. After concluding with "no difficulty" that the law "discriminates against interstate commerce," *id.* at 476, the Supreme Court held that it was "not saved by the Twenty-first Amendment." *Id.* at 489. It noted that states have broad power to regulate alcohol under the Twenty-first Amendment and that "the three-tier system itself is 'unquestionably legitimate.'" *Id.* at 488–89 (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)). But the Court emphasized that this power "does not allow States to ban, or severely limit, the direct shipment of out-of-state wine while simultaneously authorizing direct shipment by in-state producers." *Id.* at 493. "If a State chooses to allow direct shipment of wine, it must do so on evenhanded terms." *Id.*

Following *Granholm*, the circuits divided over how broadly to apply its holding. Some circuits read *Granholm* as establishing a more limited rule "immunizing the three-tier system from constitutional attack so long as it does not discriminate between in-state and out-of-state *producers* or *products*," while others read it broadly to stand for a "general non-discrimination principle" applicable to all three tiers including retailers. *Lebamoff Enters., Inc. v. Rauner*, 909 F.3d 847, 853–54 (7th Cir. 2018) (collecting cases); *see also Byrd v. Tenn. Wine & Spirits Retailers Ass'n,* 883 F.3d 608, 616–18 (6th Cir. 2018) (same).

In *Tennessee Wine*, the Supreme Court unequivocally endorsed the broader reading. The case involved Tennessee's law limiting alcohol retail licenses to those who had been

37

state residents for at least a two-year period. 139 S. Ct. at 2456. The Court squarely rejected the proposition that *Granholm*'s nondiscrimination principle applied only to producers and products, but not retailers or distributers: "There is no sound basis for this distinction." *Id.* at 2470–71. Nothing in *Granholm*'s "reading of history or its Commerce Clause analysis was limited to discrimination against products or producers," but rather forbade "discrimination against all out-of-state economic *interests*" that "deprived *citizens* of their right to have access to the markets of other States on equal terms." *Id.* at 2471 (quotation marks and citations omitted) (emphasis in original). Accordingly, Tennessee's durational-residency requirement for retailers was prohibited by the dormant Commerce Clause and not saved by the Twenty-first Amendment. *Id.* at 2476.

Adding *Granholm* and *Tennessee Wine* together, the writing is on the wall. The former explained that states may not implement discriminatory direct-shipment laws favoring in-state producers over out-of-state competitors. And the latter emphasized that this principle was not limited to producers, but applied to all out-of-state interests. The sum total is that North Carolina cannot implement discriminatory direct-shipment laws favoring in-state retailers over out-of-state retailers.

B.

Nevertheless, the majority upholds the law as part of North Carolina's three-tiered scheme, which is itself "unquestionably legitimate." Maj. Op. at 23 (quoting *Granholm*, 544 U.S. at 489). Respectfully, I believe the majority commits the very same mistake identified in *Tennessee Wine* by "read[ing] far too much into *Granholm*'s discussion of the three-tiered model," which exists to track and regulate the distribution of alcohol. 139 S.

38

Ct. at 2471; *see also id.* at 2463 & n.7. "Although *Granholm* spoke approvingly of that basic model, it did not suggest that § 2 sanctions every discriminatory feature that a State may incorporate into its three-tiered scheme." *Id.* And "[a]t issue in the present case is not the basic three-tiered model of separating producers, wholesalers, and retailers," *id.*, but rather North Carolina's choice to impose on the third tier what amounts to a physical-presence requirement. In my view, that choice is not essential to maintaining a three-tiered scheme.

The crux of the three-tiered system is to prevent vertical integration in alcohol distribution systems by strictly "separating producers, wholesalers, and retailers." *Tenn. Wine*, 139 S. Ct. at 2471; *see also Granholm*, 544 U.S. at 466 ("Separate licenses are required for producers, wholesalers, and retailers. . . . [B]oth state and federal laws limit vertical integration between tiers.") (citing FTC, Possible Anticompetitive Barriers to E-Commerce: Wine (July 2003) (hereinafter FTC Report)). The "vertical quarantine" among tiers is consistently called out as the scheme's defining feature. *Bainbridge v. Turner*, 311 F.3d 1104, 1106 (11th Cir. 2002); *see, e.g.*, *Whitmer*, 956 F.3d at 868 ("[B]usinesses at each tier must be independently owned, and no one may operate more than one tier."); *Sarasota Wine Market, LLC v. Schmitt*, 987 F.3d 1171, 1176 (8th Cir. 2021) ("A central feature of the separated tiers is to prohibit a member of one tier from having a financial interest in a member of a higher or lower tier."); Maj. Op. at 5.

Beyond that, "there is no one archetypal three-tier system." *Rauner*, 909 F.3d at 855 (citation omitted); *see also Tenn. Wine*, 139 S. Ct. at 2472 (citing FTC Report, *supra*, at 7–9). And "each variation must be judged based on its own features." *Tenn. Wine*, 139 S. Ct.

at 2472. A discriminatory variation does not find sanctuary in the Twenty-first Amendment if it is not "essential" to preserving the three-tiered model. *Id.* The Supreme Court has already explained that a residency requirement for liquor licenses "is not an essential feature of a three-tiered scheme," observing that many states maintain such schemes without requiring retailers to be in-state residents. *Id.* at 2471–72 (citing FTC Report, *supra*, at 7–9).

The majority fails to adequately explain why the feature in the case at bar is any different. Prohibiting wine shipments to consumers from out-of-state retailers is no more essential to a three-tiered model than residency requirements. One can easily imagine a state maintaining a strict licensing regime to ensure that the tiers remain distinctly owned, while treating in-state and out-of-state retailers alike. Indeed, many states with three-tiered systems do allow out-of-state retailers to ship wine on the same terms as in-state retailers. J.A. 91, 245–46; *e.g.*, Cal. Bus. & Prof. Code § 23661.2; Conn. Gen. Stat. § 30-18a; Idaho Code § 23-1309A; La. Rev. Stat. § 26:359; Neb. Rev. Stat. § 53-123.15; N.H. Rev. Stat. § 178:27; N.M. Stat. § 60-7A-3; Or. Rev. Stat. § 471.282; Va. Code §§ 4.1-206.3(F), -209.1; W. Va. Code § 60-8-6; Wyo. Stat. § 12-2-204.

In no way is the three-tiered system jeopardized by a requirement of evenhandedness. Allowing imported wine does not necessitate allowing *unregulated* wine. Nothing stops North Carolina from requiring out-of-state retailers to obtain a state shipping license and comply with the same conditions as in-state retailers. *See, e.g.*, FTC Report, *supra*, at 7–8; J.A. 243 (Model Direct Shipping Bill); *Granholm*, 544 U.S. at 491–92 (referencing the Model Direct Shipping Bill favorably). One of those conditions could be

40

that retailers sell wine to North Carolina consumers only if it has been purchased from a wholesaler. In all events, the conditions are for North Carolina to decide, so long as they have the virtue of being facially evenhanded.

Trying a somewhat different tack, North Carolina argues that discriminatory treatment of out-of-state retailers is simply the natural result of inherent features of the three-tiered system. The rationale goes like this: as a starting point, some courts have held that states may limit alcohol sales to licensed retailers with a physical storefront in the state. *See Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 743 (5th Cir. 2016) (citing *Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 821 (5th Cir. 2010)); *Whitmer*, 956 F.3d at 870 (citing *Byrd*, 883 F.3d at 623 n.8). And if the state may permissibly require retailers to be physically present, it naturally can allow those retailers to make sales in any form—in-store, curbside, or delivery—while forbidding non-present retailers from doing the same. *See Wine Country*, 612 F.3d at 820–21; *Whitmer*, 956 F.3d at 870 ("If Michigan may . . . require retailers to locate within the State, may it limit the delivery options created by the new law to in-state retailers? The answer is yes."). Any resulting difference between in-state and out-of-state retailers is supposedly just the way things always are in a three-tiered system.

I could not disagree more. To begin with, our circuit has never held that states may require retailers to be physically present in the state. As already explained, a state could maintain three strictly regulated, separately owned tiers without also requiring retailers to be physically present, and many states do so.

41

Nor has the Supreme Court ever sanctioned physical-presence requirements. In *Granholm*, for instance, the Court struck down a state law requiring wineries to "establish[] a bricks-and-mortar distribution operation" in the state to do business there. 544 U.S. at 475. It explained that it has always "viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145 (1970)). Likewise, *Tennessee Wine*'s holding that states cannot limit retail licenses to in-state residents strongly suggests as much. *See* 139 S. Ct. at 2472 (rebutting arguments in favor of "in-state presence and residency requirements"); *id.* at 2484 (Gorsuch, J., dissenting) (noting that the majority's holding calls into question "physical presence laws . . . requiring [retailers] to have a brick-and-mortar store in the State").

In any event, there is no need to decide the larger question of whether physical-presence requirements are always or never constitutional. A state that limits *all* alcohol sales to in-person storefronts, for instance, would present a different case. North Carolina has not done that; it allows mail-order and Internet wine sales with delivery anywhere in the state. It has thus rendered an in-state physical storefront unnecessary to its distribution model. *See Rauner*, 909 F.3d at 856–57; *Whitmer*, 956 F.3d at 877 (McKeague, J., concurring) (doubting that, given the modern "ubiquity of online sales," a physical-presence requirement "is just a coda to Michigan's three-tier regulations"). Receiving Internet orders and shipping to consumers is something that both in-state *and* out-of-state retailers are perfectly capable of doing, but only the former is currently allowed to do. And

42

once North Carolina "chooses to allow direct shipment of wine, it must do so on evenhanded terms." *Granholm*, 544 U.S. at 493.

C.

Even if I were to agree with the majority that a physical-presence requirement for retailers is essential to maintaining a three-tiered system, North Carolina's laws as applied here would still fail. That is because North Carolina does not have a three-tiered system when it comes to wine.

In general, North Carolina requires alcohol to flow through all three separate tiers before it may be imbibed. *See, e.g.*, N.C. Gen. Stat. § 18B-1300. But not wine. Where wineries are concerned, the three-tiered system no longer holds. North Carolina specifically allows wineries to obtain a "wine shipper permit" "to sell and ship [up to] two cases of wine per month to any person in North Carolina to whom alcoholic beverages may be lawfully sold." *Id.* § 18B-1001.1. Wineries may also "[o]btain a wine wholesaler permit to sell, deliver, and ship at wholesale unfortified wine manufactured at the winery." *Id.* § 18B-1101(7). Thus, wine may be sent from the producer directly to a retailer (bypassing a separate wholesaler) or directly to a consumer (bypassing a wholesaler and retailer altogether). For wine, then, North Carolina's is not a regime premised on three separately owned tiers. It is a regime premised simply on permitting. That permitting system must be evenhanded.

North Carolina characterizes the winery shipper permits as simply a "limited exception" to its three-tiered system and insists that small exceptions should not require it to abandon its three-tiered system altogether. *See* Resp. Br. 41. I grant that states may

43

choose to make exceptions while still maintaining their interest in three-tiered systems generally. But this is no limited exception—it *is* an abandonment of the three-tiered system *for wine*. North Carolina may still have a three-tiered scheme for distribution of other alcoholic beverages, but by allowing wine producers, as opposed to retailers, to ship directly to consumers, it has eviscerated any semblance of a three-tiered distribution scheme *for wine*. At the very least, then, it fights a losing battle in its claim that having *wine* retailers physically present in the state, or having all wine flow through each of the three tiers, is somehow essential.

## III.

I do not think the Twenty-first Amendment can wholly shield North Carolina's discriminatory law. But one more step is left to strike it, for even a discriminatory law may pass dormant Commerce Clause muster if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Granholm*, 544 U.S. at 489 (quoting *New Energy Co.*, 486 U.S. at 278). In alcohol regulation cases, the inquiry is slightly "different." *Tenn. Wine*, 139 S. Ct. at 2474. "Recognizing that § 2 was adopted to give each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens, we ask whether the challenged [law] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.* And "'mere speculation' or 'unsupported assertions' are insufficient to sustain a law that would otherwise violate the Commerce Clause"; we instead require "concrete evidence" that the law "actually promotes public

44

health or safety." *Id.* (quoting *Granholm*, 544 U.S. at 490, 492). An asserted objective also fails if it could "easily be achieved by ready [nondiscriminatory] alternatives." *Id.*

Without a doubt, the three-tiered system as a whole is admirable and justified on public health and safety grounds. Yet this analysis must focus on the particular "provision at issue"—North Carolina must justify the *discrimination*. *Tenn. Wine*, 139 S. Ct. at 2474. So the question is whether prohibiting out-of-state retailers from shipping directly to consumers, while allowing in-state retailers to do so, is justified on recognized health and safety grounds, rather than being predominantly protectionist.

North Carolina offers three primary justifications for this feature: preventing the sale of alcohol to minors, collecting taxes on alcohol sales, and enhancing safety. All these interests are certainly important, and it is North Carolina's prerogative to further them by regulating the flow of alcohol. But it may not do so in an unjustifiably discriminatory way. And none of its asserted interests justifies this differential treatment.

Take, for example, the sale of alcohol to minors. North Carolina has fallen well short of providing "concrete evidence" that its underage-drinking interest is at issue here, for the same reasons as in *Granholm*. *See* 544 U.S. at 490–92. The record lacks evidence "that the purchase of wine over the Internet by minors is a problem," which is "not surprising" given minors' preference for other types of alcohol and their need for instant gratification. *Id.* at 490; *see* FTC Report, *supra*, at 12, 33–34; J.A. 202 (showing that the majority of underaged drinkers obtained their alcohol from an adult). Even if direct shipping does increase the risk of underage drinking, it does not justify discriminatory treatment as "minors are just

45

as likely to order wine from in-state [retailers] as from out-of-state ones," or for that matter directly from wineries. *Granholm*, 544 U.S. at 490.

More importantly, though, all of North Carolina's stated objectives could be readily accomplished through nondiscriminatory alternatives. One option is to impose "an evenhanded licensing requirement." *Granholm*, 544 U.S. at 492. Many other states have implemented such systems, *see* J.A. 245–46, as has North Carolina itself with respect to wineries, *see* N.C. Gen. Stat. § 1001.1. The license usually requires out-of-staters to remit taxes, consent to jurisdiction, undergo audits, and comply with various other regulatory requirements. *See* J.A. 95; FTC Report, *supra*, at 3, 8, 27–28. Out-of-state shipper permits could address each of North Carolina's stated concerns. *See Granholm*, 544 U.S. at 490–91 (explaining that the State could "require[] an adult signature on delivery and a label so instructing on each package" to prevent delivery to minors); *id.* at 491 (explaining that the State "could protect itself against lost tax revenue by requiring a permit as a condition of direct shipping," an approach which other states have taken "and report no problems with tax collection"); *Tenn. Wine*, 139 S. Ct. at 2476 (explaining that licenses could "limit both the number of retail licenses and the amount of alcohol that may be sold to an individual" to promote safe sales and consumption).

To the extent that North Carolina is worried about out-of-staters evading state regulations, that concern too is unfounded. North Carolina "of course remains free to monitor the practices of retailers and to take action against those who violate the law." *Id.* It can inspect out-of-state retailers' books and financials remotely, for "improvements in technology have eased the burden of monitoring out-of-state" entities. *Granholm*, 544 U.S.

at 492. "In this age of split-second communications by means of computer networks . . . there is no shortage of less burdensome, yet still suitable, options." *Tenn. Wine*, 139 S. Ct. at 2475 (quoting *Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir. 1994)). And it can enforce its laws through the Twenty-first Amendment Enforcement Act, which allows its attorney general to obtain injunctive relief in federal court against alcohol suppliers who violate state law. *See* 27 U.S.C. § 122a; FTC Report, *supra*, at 10.

But even if North Carolina takes issue with those alternatives or thinks they might weaken its grip on alcohol regulation, there is another obvious nondiscriminatory option— one which indisputably preserves each of the State's stated interests. North Carolina could simply not allow direct shipping from wine retailers at all. That there exists such an easy nondiscriminatory alternative, fully protective of every interest the state has asserted under § 2, is what makes the State's Commerce Clause violation so blatant. And the availability of that alternative should inform any choice of remedy.

IV.

Where, as here, unconstitutional discrimination results from the combination of two otherwise-permissible provisions, the court faces "two remedial alternatives": extend the benefit to the disfavored group or withdraw the benefit from the favored group. *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970) (Harlan, J., concurring in the result)); *see also Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 569 (2015). "The choice between these outcomes is governed by the legislature's intent, as revealed by the statute at hand." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1699 (2017). "In making this assessment, a court should 'measure the intensity

47

of commitment to the residual policy . . . and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation.'" *Id.* at 1700 (quoting *Heckler*, 465 U.S. at 739 n.5). In many cases, "th[e] choice may well be dictated by the severability clause enacted" as part of the statutory scheme. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 347 (1996); *see also Heckler*, 465 U.S. at 740.

In this case, the choice is easy. For the State itself has expressly stated that its preferred remedy, should it lose on the merits, "is to restrict in-state shipping, not to extend shipping privileges to out-of-state retailers." Resp. Br. 48. And this position is supported by the statute, which states that it is to be "construed to the end that the sale, purchase, transportation, manufacture, consumption, and possession of alcoholic beverages shall be *prohibited except as authorized* in this Chapter." N.C. Gen. Stat. § 18B-100 (emphasis added). The statute's severability clause likewise instructs that any unconstitutional provisions should be stricken "and the remaining provisions shall be construed in accordance with the intent of the General Assembly to further *limit rather than expand* commerce in alcoholic beverages" and "to *enhance strict regulatory control* over taxation, distribution, and sale of alcoholic beverages through the three-tier regulatory system." *Id.* (emphasis added). It is hard to imagine more unambiguous directions.

Each of B-21 Wines' counterarguments is unavailing. First, I "reject the plaintiffs' suggestion that they have placed at issue only the selected portions of North Carolina's ABC laws that regulate direct importation and that they can themselves select the portions to be stricken and those to be preserved." *Beskind*, 325 F.3d at 518. Since the constitutional violation results from the "conjunctive effect" of multiple provisions, B-21 Wines has

48

effectively put each of them into play. *Id.* While a limited remedy may not be the result that plaintiffs desire, "their right is not to void a law protected by the Twenty-first Amendment but rather to eliminate discrimination in interstate commerce." *Id.* at 520. Second, I would decline B-21 Wines' invitation to extrapolate North Carolina's wishes from its past actions, namely its statutory expansion of wine shipment rights after a more limited remedy was imposed in *Beskind*. There is no need to guess at legislative intent from past actions, which could mean a variety of things, when given the benefit of an explicit statement of purpose in the statute itself.

Most importantly, any remedy in cases involving both the Twenty-first Amendment and Commerce Clause should seek to vindicate the interest of both constitutional provisions. "[W]e can assume that North Carolina would wish us to take the course that least destroys the regulatory scheme that it has put into place pursuant to its powers under the Twenty-first Amendment." *Id.* at 519. And yet, we must eliminate "the discrimination violating the Commerce Clause." *Id.* Both objectives are accomplished by enjoining North Carolina's extension of direct shipment rights to in-state retailers.

This remedy would not only guard each of North Carolina's stated regulatory interests, but strengthen them. If there is a danger in shipping wine directly from retailers to consumers, then it would seem clear that those interests would not only be protected but promoted by limiting the advantage that in-state shippers receive. If shipments interfere with regulation or taxation, then that is true of any shipment. If the State does not want minors ordering online, that will happen less if no retailers ship from online orders. Every single interest the state points to can be protected and furthered by eliminating its bald in-

49

state preference. This remedy fully protects the states' regulatory purposes under the Twenty-first Amendment, and yet does so in an evenhanded manner.

V.

It is tempting to declare that this is nothing more than an alcoholic beverages case and that the Twenty-first Amendment sweeps all before it. I respect this view. In many areas, state sovereignty is indeed paramount. Yet in matters of commerce we are as one, and that unity has contributed to our nation's strength and endurance.

I would give full force and effect to the commerce power in this case. Doing so need not compromise state interests in the slightest. The majority is quite wrong to enable North Carolina to enact protectionist measures masquerading as part of its three-tiered scheme. I respectfully dissent.