**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2922
_____

JEAN-PAUL WEG LLC, DBA The Wine Cellarage;
LARS NEUBOHN,

Appellants

v.

DIRECTOR OF THE NEW JERSEY
DIVISION OF ALCOHOLIC BEVERAGE CONTROL;
ATTORNEY GENERAL NEW JERSEY;

FEDWAY ASSOCIATES; ALLIED BEVERAGE GROUP
LLC; OPICI FAMILY DISTRIBUTING; NEW JERSEY
LIQUOR STORE ALLIANCE,

Intervenor-Defendants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:19-cv-14716)
District Judge:  Honorable Julien X. Neals
_____

Argued: September 17, 2024

Before:  RESTREPO, PHIPPS and MCKEE, *Circuit Judges*.

(Filed: February 28, 2025)

James A. Tanford [ARGUED]
Robert D. Epstein
EPSTEIN SEIF PORTER & BEUTEL LLP
50 S. Meridian St., Suite 505
Indianapolis, IN 46204

Michael J. Cohen
Gary S. Redish
WINNE BANTA HETHERINGTON BASRALIAN & KAHN, P.C.
21 Main Street, Suite 101
Hackensack, NJ 07601
    *Counsel for Appellants*

Liza B. Fleming [ARGUED]
William C. Kennedy
Phoenix N. Meyers
Daniel M. Vannella
Michael L. Zuckerman
OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
Division of Law
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625
    *Counsel for Appellees*

Deborah A. Skakel [ARGUED]
BLANK ROME
1271 Avenue of the Americas
New York, NY 10020

Leon J. Sokol
CULLEN & DYKMAN
433 Hackensack Avenue
Hackensack, NJ 07601

Christopher S. Porrino
Peter M. Slocum
LOWENSTEIN SANDLER
One Lowenstein Drive
Roseland, NJ 07068
    *Counsel for Intervenor-Defendants*

Mollie G. Hughes
John C. Neiman, Jr.
MAYNARD NEXSEN
1901 6th Avenue N
2400 Regions, Harbert Plaza
Birmingham, AL 35203

William P. Sowers, Jr.
3132 Blithewood Drive
Richmond, VA 23225

Frederick R. Yarger
WHEELER TRIGG O'DONNELL
370 17th Street, Suite 4500
Denver, CO 80202
    *Counsel for Amicus Appellees*

_____

OPINION OF THE COURT
_____

RESTREPO, *Circuit Judge*

New Jersey, acting pursuant to the alcohol-regulating powers reserved for it by the Twenty-first Amendment, regulates the importation and sale of alcohol through a "three-tier" system that funnels alcohol sold within the state through three strictly delineated layers of regulated entities. With limited exceptions[1], all alcohol sold within the state must be sold by a producer to a New Jersey wholesaler, sold by that wholesaler to a New Jersey retailer, then sold by that retailer to the end customer. Each layer of this system is subject to its own distinct licensure and inspection requirements.

As part of its system of alcohol regulation, New Jersey permits the direct shipping of wine to New Jersey customers only by wine retailers that have a physical presence in New Jersey (the "physical presence requirement") and purchase their product from New Jersey licensed wholesalers (the "wholesaler purchase requirement"). Appellants, a New York wine retailer and its owner, contend that these requirements trespass into an area reserved for Congress under the Commerce Clause, under principles referred to as the dormant Commerce Clause. In doing so, Appellants challenge a core element of the three-tier system of alcohol regulation: the ability of a state to require alcohol to flow through its three-tier

---

[1] Most relevantly here, both in-state and out-of-state wineries can obtain a license to ship wine directly to New Jersey consumers. *See* N.J. Stat. Ann. § 33:1-10(2). Other exceptions include an allowance for casinos to purchase directly from wholesalers, *see* N.J. Admin. Code § 13:69I-1.5(e), and permission for breweries to make on-premises sales directly to customers, *see* N.J. Stat. Ann. § 33:1-10b.

system before reaching consumers. Because striking down New Jersey's challenged regulations would shake the foundations of the "unquestionably legitimate" three-tiered system of alcohol regulation, and because New Jersey has provided sufficient public health and safety justifications for its policies, we will affirm. *Granholm v. Heald*, 544 U.S. 460, 489 (2005).

## I. BACKGROUND

Jean Paul Weg, LLC, DBA "The Wine Cellarage," is a New York LLC that operates a single brick-and-mortar wine retail store in Bronx, NY, and is owned and operated by Lars Neubohn. In addition to in-person sales, The Wine Cellarage offers online wine sales and has at least one customer in New Jersey. The Wine Cellarage gives customers from New Jersey the option of either retrieving their online purchases in person or receiving their purchases through the mail via an intermediary shipper.

The Wine Cellarage is unable to directly ship wine to New Jersey customers because it does not hold a New Jersey "plenary retail license." Applicants for a plenary retail license must be fingerprinted, undergo background checks, and have a physical location in New Jersey that is subject to on-site premises inspections. New Jersey does not deny retail licenses based on the residency of applicants, offering licenses to out-of-state retailers and residents so long as they operate a store physically located in New Jersey. Because The Wine Cellarage does not have a physical location in New Jersey, it is not currently eligible to receive a plenary retail license.

In addition to its lack of a plenary retail license, The Wine Cellarage faces a second impediment to its ability to

5

directly ship wine to New Jersey: its product sourcing practices. The Wine Cellarage sources its wine from private wine collections and New York licensed wholesalers. Even if The Wine Cellarage were able to obtain a New Jersey plenary retail license, it would be unable to sell these out-of-state products to New Jersey consumers, as New Jersey retailers are prohibited from "purchas[ing] or obtain[ing] any alcoholic beverage except from the holder of a New Jersey manufacturer's or wholesaler's license or pursuant to a special permit first obtained from the Director." N.J. Admin. Code § 13:2-23.12(a).

In a bid to overturn these regulations and begin direct shipping to New Jersey consumers, The Wine Cellarage, Neubohn, and several other plaintiffs initiated this action against James Graziano, the Acting Director of the New Jersey Division of Alcohol Beverage Control, Gurbir Singh Grewal, the Attorney General of New Jersey, and Philip D. Murphy, the Governor of New Jersey, in the United States District Court for the District of New Jersey. The District Court granted Fedway Associates, Inc., Allied Beverage Group, LLC, Opici Family Distributing, and the New Jersey Liquor Store Alliance leave to intervene as defendants.

In their latest operative complaint, the Third Amended Complaint, the Wine Cellarage and Neubohn brought claims pursuant to 42 U.S.C. § 1983 for violations of the Commerce Clause and the Privileges and Immunities Clause. In the Third Amended Complaint, the Wine Cellarage and Neubohn sought relief in the form of an order declaring the set of interrelated New Jersey laws "prohibiting out-of-state wine retailers from selling, shipping, and delivering wine directly to New Jersey consumers from their out-of-state locations, unconstitutional as a violation of the Commerce Clause." App. 045–46. The

6

Third Amended Complaint also sought an "injunction prohibiting Defendants from enforcing those rules and regulations against out-of-state wine retailers, and requiring them to allow out-of-state wine retailers to obtain licenses and to sell, ship, and deliver wine directly to customers in New Jersey." App. 046.

The parties filed multiple opposing motions for summary judgment before the District Court. The District Court denied the Wine Cellarage and Neubohn's motion for summary judgment and, after initially denying all but one as moot, ultimately granted all cross-motions for summary judgment filed by the defendants.

Appellants filed a notice of appeal challenging the District Court's summary judgment rulings. The sole issue on appeal is Appellants' Commerce Clause argument, as Appellants abandoned their Privileges and Immunities Clause argument in the District Court and do not pursue any evidentiary challenges on appeal.

We have jurisdiction under 28 U.S.C. § 1291. "We review the grant or denial of summary judgment de novo," *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 708 (3d Cir. 2019), "applying the same standard [the District Court] must apply," *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 144 (3d Cir. 2023) (quoting *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021). Accordingly, we must determine "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

7

## II. DISCUSSION

The Constitution's Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Though the Commerce Clause does not explicitly curtail the states' power to regulate interstate commerce, courts "have sensed a negative implication in the provision since the early days" of this nation. *Dep't of Revenue v. Davis*, 553 U.S. 328, 337 (2008). This negative implication, referred to as the dormant Commerce Clause, prohibits states from engaging in undue economic protectionism. In reviewing a standard dormant Commerce Clause challenge, first "we ask whether a challenged law discriminates against interstate commerce." *Id*. at 338. If a law discriminates, it is "'virtually *per se* invalid,' . . . and will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id*. (quoting *Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99–101 (1994)).

In the context of state regulation of alcohol, this relatively straightforward test is complicated by the special authority over alcohol reserved for states by the Twenty-first Amendment. Section 2 of the Twenty-first Amendment ("Section 2") declares that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. The Supreme Court has interpreted Section 2 "as one part of a unified constitutional scheme," the main "thrust" of which "is to 'constitutionaliz[e]' the basic structure of federal-state alcohol regulatory authority that prevailed prior to the adoption of the Eighteenth Amendment." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 519–20

8

(2019) (quoting *Craig v. Boren*, 429 U.S. 190, 206 (1976)).

The interplay between this grant of authority and the dormant Commerce Clause's restrictions is deeply analyzed in two contemporary Supreme Court cases: *Granholm v. Heald*, 544 U.S. 460 (2005), and *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504 (2019).

In *Granholm*, the Court struck down a set of state laws that permitted in-state wineries, but not out-of-state wineries, to ship directly to consumers. *Granholm*, 544 U.S. at 493. These state laws created, in effect, a limited exception from the three-tier system for in-state wineries but denied the same benefit to out-of-state wineries.

The *Granholm* Court surveyed its prior Twenty-first Amendment rulings, reaffirming that "the Twenty-first Amendment does not supersede other provisions of the Constitution and, in particular, does not displace the rule that States may not give a discriminatory preference to their own producers." *Id*. at 486. The Court summarized three main features of its prior relevant holdings: (1) "state laws that violate other provisions of the Constitution are not saved by the Twenty-first Amendment"; (2) "§ 2 does not abrogate Congress' Commerce Clause powers with regard to liquor"; and (3) "state regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause." *Id*. at 486–487.

The *Granholm* Court assessed the challenged regulations by first querying whether they were "saved" from dormant Commerce Clause scrutiny by the Twenty-first Amendment. *Granholm*, 544 U.S. at 489. It concluded that they were not: though "[s]tate policies are protected under

9

the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent," the Court found the challenged regulations "involve straightforward attempts to discriminate in favor of local producers." *Id*.

In reaching this conclusion, the Court specifically disavowed the argument that this holding "would call into question the constitutionality of the three-tier system." *Id*. at 488. The Court noted that it had "previously recognized that the three-tier system itself is 'unquestionably legitimate,'" *id*. at 489 (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)), and had "held previously that States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment," *id*. at 466 (citing *North Dakota*, 495 U.S. at 432).[2]

Having held that the Twenty-first Amendment did not shield the challenged regulations, the Court proceeded to "consider whether either state regime 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id*. at 489 (quoting *New Energy Co. v. Limbach*, 486 U.S. 269, 278 (1988)). The states advanced two main purported purposes for their challenged regulations: "keeping alcohol out of the hands of minors and

---

[2] The *Granholm* Court also cited favorably to Justice Scalia's concurrence in *North Dakota v. United States*, wherein he concluded that "The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler." *Id*. at 489 (quoting *North Dakota*, 495 U.S. at 447 (Scalia, J., concurring in judgment)).

10

facilitating tax collection." *Id*. at 489.

The Court found these justifications to be pretextual and backed by "little concrete evidence." *Id*. at 492. Protecting minors was no reason for treating out-of-state wineries differently, as shipments from both in-state and out-of-state wineries posed the same limited risk of facilitating sales to minors. *Id*. at 490. The states' tax rationale did not justify the differential treatment either, since the existing system of "licensing and self-reporting" already used for out-of-state wineries' sales to wholesalers could be employed with equal efficacy for direct-to-consumer sales. *Id*. at 491. Because the challenged regulations were discriminatory and lacked adequate justification, the Court declared them unconstitutional. *Id*. at 493.

Fourteen years later, the Court again revisited its Twenty-first Amendment jurisprudence in *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504 (2019), where it struck down a two-year residency requirement that Tennessee had imposed on retail liquor store license applicants. The *Tennessee Wine* Court concluded that Section 2 "allows each State leeway to enact the measures that its citizens believe are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests." *Id*. at 538.

In keeping with this purpose, the Court held that "because of § 2, we engage in a different inquiry" from a standard dormant Commerce Clause analysis when a state's alcohol regulation is challenged. *Id*. at 539. This "different inquiry," as laid out by the *Tennessee Wine* Court, involves two

11

main steps. First, courts determine whether the challenged regulation "discriminates on its face against nonresidents." *Id*. Second, courts "ask whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id*. At this second step, the Court reiterated *Granholm*'s directive that "'mere speculation' or 'unsupported assertions' are insufficient to sustain a law that would otherwise violate the Commerce Clause." *Id*. (quoting *Granholm*, 544 U.S. at 490).

The *Tennessee Wine* Court also further clarified "*Granholm*'s discussion of the three-tiered model." *Id*. at 535. The Court explained that though "*Granholm* spoke approvingly of that basic model, it did not suggest that § 2 sanctions every discriminatory feature that a State may incorporate into its three-tiered scheme." *Id*. The Court found that Tennessee's durational residency requirement was "not an essential feature of a three-tiered scheme" and therefore could be struck down without challenging the legitimacy of the three-tier system itself. *Id*.

This Circuit last addressed the interplay between the dormant Commerce Clause and the Twenty-first Amendment in *Freeman v. Corzine*, 629 F.3d 146 (3d Cir. 2010)—a case decided nearly a decade before *Tennessee Wine*, and therefore without the benefit of the further clarity provided by the Court therein. In *Freeman*, this Court relied on *Granholm* and employed a form of "heightened scrutiny," *id*. at 158 (quoting *Am. Trucking Ass'ns v. Whitman*, 437 F.3d 313, 319 (3d Cir. 2006)), that upholds discriminatory alcohol regulations only if they "serve[] local purposes that would not be as well served

12

by non-discriminatory legislation," *id*. at 161.[3]  The District Court, relying in large part on *Freeman*, applied this same standard to this case.

Today, with the benefit of *Tennessee Wine*'s additional guidance, we hold that *Tennessee Wine* compels us to apply a different standard.  *Tennessee Wine* clarified that it is not a standard dormant Commerce Clause inquiry that controls when a state's alcohol regulations are challenged, but instead a "different inquiry" that asks of discriminatory regulations "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground."  *Tenn. Wine*, 588 U.S. at 539. Accordingly, in keeping with this controlling standard, we first assess whether New Jersey's challenged regulations discriminate against nonresidents.

*A. New Jersey's Challenged Regulations Discriminate against Nonresidents*

The District Court relied on the test used in *Freeman* to evaluate whether New Jersey's statutory scheme is discriminatory, querying whether New Jersey law "discriminates against interstate commerce on its face or in effect."  App. 024 (quoting *Freeman*¸ 629 F.3d at 158).  The District Court found that New Jersey's scheme was not facially discriminatory "because it requires that in-state and out-of-state wine retailers sell and deliver wine through the New

---

[3] The *Freeman* Court also followed *Granholm* in reiterating that a "three-tier system . . . is 'unquestionably legitimate.'" *Freeman*, 629 F.3d at 151 (quoting *Granholm*, 544 U.S. at 489).

13

Jersey System." App. 024. However, the District Court found that New Jersey's regulatory system "may be discriminatory" in effect because the in-state physical location requirement and mandate to purchase from New Jersey wholesalers are "additional steps that drive up the cost" of out-of-state retailers' products. App. 025 (quoting *Granholm¸* 544 U.S. at 474).

Appellants contend that the combination of New Jersey laws that "allows in-state retailers to engage in online sales and home deliveries of wine but prohibits out-of-state retailers from doing so" is straightforwardly discriminatory against out-of-state economic interests. Appellants' Br. at 20. Appellants liken this case to *Granholm*, wherein the Court found a requirement that "[o]ut-of-state wineries must open a branch office and warehouse in New York" to become eligible for direct-shipping introduced "additional steps that drive up the cost of their wine," was prohibitively expensive, and "runs contrary to our admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Granholm*, 544 U.S. at 474–475 (quoting *Halliburton Oil Well Cementing Co. v. Reily¸* 373 U.S. 64, 72 (1963)).

Appellees respond that New Jersey's statutory scheme is even-handed, with in-state and out-of-state retailers subjected to the same physical location and wholesaler purchasing requirements. Appellees point to a line of post-*Granholm* decisions in other circuits that found in-state presence requirements to be nondiscriminatory when employed in furtherance of a three-tier system. *See, e.g., Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1183–84 (8th Cir. 2021) (finding that "retailer or wholesaler residency or physical presence requirements, or the mandate to purchase only from in-state wholesalers . . . are likely to impose greater

14

costs than would otherwise be incurred by an out-of-state retailer selling to [in-state] consumers" but are non-discriminatory because they "impose[] the same licensing requirements on in-state and out-of-state retailers.").

Appellees also attempt to differentiate *Granholm*, writing:

> Unlike in *Granholm*, where requiring "all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers" served to "increase the cost of out-of-state wines to Michigan consumers," the relevant costs for opening an alcohol store in New Jersey are the same whether the would-be seller lives in Jersey City or Juneau.

State Appellees' Br. at 30–31 (cleaned up) (quoting *Granholm*, 544 U.S. at 474). Appellees' endeavor to distinguish the facts of this case from *Granholm* is unavailing. In *Granholm*, the Court rejected the similar argument that "an out-of-state winery has the same access to the State's consumers as in-state wineries: All wine must be sold through a licensee fully accountable to New York; it just so happens that in order to become a licensee, a winery must have a physical presence in the State." *Granholm*, 544 U.S. at 474. The *Granholm* Court found this argument "unconvincing," holding that the physical presence requirement imposed a disproportionate financial burden on existing out-of-state wineries, which must bear the expense of "open[ing] a branch office and warehouse in New York" to become a licensee. *Id*. at 474.

The same conclusion is compelled here. New Jersey's physical presence requirement forces existing out-of-state

15

retailers to bear the expense of opening a New Jersey location, while New Jersey's wholesaler purchase requirement compels existing retailers to bear the expense of reconfiguring their product-sourcing processes. Accordingly, New Jersey's challenged regulations impose a heightened financial burden on existing out-of-state retailers and therefore are discriminatory in effect. Accordingly, we next address whether the challenged regulations "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Tenn. Wine*, 588 U.S. at 539.

### B. New Jersey's Challenged Regulations Can Be Justified on Legitimate Nonprotectionist Grounds

After finding that New Jersey's challenged laws may have discriminated against out-of-state economic interests, the District Court turned to the question of whether the laws were justified by a legitimate local purpose. The District Court found New Jersey's physical presence requirement justified by the state's public health interest in ensuring that all "alcohol sold to New Jersey consumers passes through New Jersey's three-tier system" and facilitating random site visits to ensure compliance with New Jersey's regulations. App. 026 (quoting Sapolnick Decl. ¶¶ 10–11). The District Court likewise found New Jersey's wholesaler purchase requirement to be justified by the state's public health interest in quickly identifying sources of contamination and facilitating product recalls.

The District Court found these benefits to be adequately supported by concrete evidence in the form of three declarations: one submitted by Deputy Attorney General Andrew R. Sapolnick; one submitted by Executive Vice President of Allied Beverage Group, LLC, Robert Harmelin;

16

and one submitted by Executive Vice President of Fedway Associates, Inc., Robert D. Sansone. These declarations described real-world examples of successful product recalls and unannounced inspections that revealed illicit activity, which the District Court found sufficiently concrete and compelling to justify the challenged regulations. The District Court also found the challenged regulations justified because "[t]he licensing, physical presence, and wholesaler wine purchase requirements go [to] the root of the New Jersey System." App. 028.

Appellants contend that the concerns reflected in the Sapolnick, Harmelin, and Sansone declarations are overblown and not concretely evidenced. Appellants argue that the purported risks of direct-shipping out-of-state wine have not been borne out in reality: jurisdictions that allow direct shipping from retailers "have not experienced any significant alcohol-related public health or safety problems," Appellants' Br. at 39, and "New Jersey has been allowing out-of-state wineries to ship to consumers for more than a decade" with "no evidence that it has caused any problems," *id.* at 40. Appellants further contend that New Jersey's policy goals could be fulfilled with a simple nondiscriminatory alternative: "a licensing system requiring out-of-state retailers to get a permit and abide by [New Jersey's] regulations." Appellants' Br. at 42.

As for the District Court's finding that the challenged regulations "go [to] the root of the New Jersey System," App. 028, Appellants assert that New Jersey has "abandoned" the three-tier system as to wine, Appellants' Br. at 29, by permitting wineries to sell wine directly to consumers without any requirement that it pass through a wholesaler. Appellants further argue that the challenged regulations could not be an

17

essential feature of the three-tier system because "sixteen [states] have not required [a physical presence] for retail sales and shipping by out-of-state wine stores." Appellants' Reply at 7.

Appellants' arguments are not convincing, and we hold that New Jersey's challenged regulations are justified both on public health and safety grounds and as an essential feature of New Jersey's three-tier system.

### a. Public Health and Safety

We find that the declarations submitted by Appellees are sufficient concrete evidence of the challenged regulations' public health and safety justifications. The Sapolnick Declaration provides evidence that New Jersey's wholesaler purchase requirement furthers New Jersey's goal of quickly identifying product tampering and contamination: because all products must pass through licensed wholesalers, New Jersey is "able to track particular products back through the distribution system to identify the source of contamination, to facilitate product recalls and to take other prompt action." Sapolnick Decl., App. 479 ¶ 13. The Sansone and Harmelin Declarations provided further evidence of this efficacy, detailing several instances in which wholesalers were able to efficiently segregate products that had quality control problems, preventing defective products from reaching consumers.

The Sapolnick Declaration also evidenced the benefits of New Jersey's physical presence requirement, which facilitates inspections and investigations that produced 611 referrals for prosecution in 2020 alone. These investigations have uncovered undisclosed interests in retail licenses held by

disqualified persons, inaccurate financial records, unaccounted-for cash, prohibited sales of alcohol, and sales of fraudulent products.

Additionally, the Sapolnick Declaration reported that because "[New Jersey's Division of Alcoholic Beverage Control]'s jurisdiction is limited to New Jersey, it has no practical means by which to conduct warrantless searches and seizures of evidence and property located outside of New Jersey." *Id*. at App. 483 ¶ 24. If out-of-state retailers were allowed to ship directly to New Jersey customers, New Jersey regulators "would have to rely upon the willingness of out-of-state agencies to conduct the on-site inspections and investigations," *id*., placing New Jersey in a tenuous position because "[i]n the past, the New York State Liquor Authority . . . has refused to assist [New Jersey's Division of Alcoholic Beverage Control] in regulatory oversight of its licensees," *id*. at App. 484 ¶ 26.

Taken together, these three declarations provide historical evidence of the efficacy of New Jersey's wholesaler purchase requirement in facilitating product quality control and of New Jersey's physical presence requirement in facilitating investigations that protect consumers from fraudulent and prohibited sales of products. The declarations are sufficiently concrete evidence, and not "mere speculation" or "unsupported assertions," that New Jersey's "challenged requirement[s] can be justified as a public health or safety measure." *Tenn. Wine*, 588 U.S. at 539 (quoting *Granholm*, 544 U.S. at 490).

In this regard, New Jersey's regulations sharply diverge from those challenged in *Granholm*. *Granholm* concerned a limited loophole created for in-state wineries that was denied without basis to out-of-state equivalents. *Granholm*, 544 U.S.

at 492. New Jersey's challenged policies, in contrast, are key elements of its regulatory framework backed by concrete evidence of efficacy. Though each concerned the shipment of wine, New Jersey's regulations differ vastly in scope and effect from the *Granholm* regulations, compelling a different outcome here.

Appellants' contention that other states have succeeded in permitting wine shipments from out-of-state retailers does not disrupt this analysis: different states are permitted "leeway in choosing the alcohol-related public health and safety measures that its citizens find desirable." *Tenn. Wine*, 588 U.S. at 510. That different states purportedly have not experienced problems with their own desired policy choices does not strip New Jersey of its ability to select policies it can justify with concrete evidence of efficacy.

Appellants' proposed nondiscriminatory alternative of "a licensing system requiring out-of-state retailers to get a permit and abide by [New Jersey's] regulations" likewise does not dictate a different outcome. Appellants' Br. at 42. As an initial matter, we agree with the Fourth Circuit's holding in *B-21 Wines, Inc. v. Bauer* that the relevance of nondiscriminatory alternatives is of lessened importance under the *Tennessee Wine* test than in a standard dormant Commerce Clause analysis. *See* 36 F.4th 214, 225–26 (4th Cir. 2022) ("Although consideration of nondiscriminatory alternatives could have some relevance to [the inquiry as to a law's justification on public health grounds], it does not transform the applicable framework into the test that ordinarily applies to a dormant Commerce Clause challenge when the Twenty-first Amendment is not implicated."). Regardless, the Sapolnick Declaration's account of New Jersey's limited enforcement jurisdiction and the uncertainty of securing assistance from

20

other states' regulators undercuts Appellants' proposed alternative. Though New Jersey could demand that out-of-state licensees abide by its regulations, the Sapolnick Declaration establishes that New Jersey would have no certain ability to enforce these regulatory mandates outside of the state.

### b. New Jersey's Challenged Regulations are Essential Features of the Three-Tier System

New Jersey's challenged regulations are also independently justified as essential features of its three-tier system. The Supreme Court has repeatedly reiterated "that the three-tier system itself is 'unquestionably legitimate.'" *Granholm*, 544 U.S. at 489 (quoting *North Dakota*, 495 U.S. at 432). Though the *Tennessee Wine* Court notes that Section 2 does not "sanction[] every discriminatory feature that a State may incorporate into its three-tiered scheme," it suggests that "essential features" of the three-tier system pass constitutional muster. *Tenn. Wine*, 588 U.S. at 535. This logic is sound: if the system itself is constitutional, then the core features that define the system are also constitutional.

Contrary to Appellants' contentions, New Jersey has not "abandoned" its three-tier system as to wine. Appellants' Br. at 29. The direct-shipping exception New Jersey has created for wineries is limited, does not apply to retailers, and does not negate the existence of a three-tier system for non-wineries. *See, e.g.*, *B-21 Wines*, 36 F.4th at 226 ("[W]e have no reason to rule today that the limited statutory exception made available by North Carolina to in-state and out-of-state wineries means that the State has abandoned its three-tier system."). New Jersey maintains a robust three-tier system as

to wine retailers, as is well within the state's powers under the Twenty-first Amendment.

Perhaps the most foundational element of a three-tier system is a state's ability to prohibit the sale of alcohol that has not passed through its three-tier system. As several other circuits have recently held, permitting out-of-state retailers to sell alcohol from outside of a state's three-tier system creates a regulatory hole large enough to shake the foundations of the three-tier model. *See, e.g.*, *id*. at 228 ("[T]he Retail Wine Importation Bar is an integral part of North Carolina's three-tier system. To begin with, the Bar directly relates to North Carolina's ability to separate producers, wholesalers, and retailers. . . . [T]he direct shipping of alcoholic beverages to North Carolina consumers by out-of-state retailers would completely exempt those out-of-state retailers from the three-tier requirement."); *Lebamoff Enters. Inc. v. Whitmer*, 956 F.3d 863, 872 (6th Cir. 2020) ("[T]here is nothing unusual about the three-tier system, about prohibiting direct deliveries from out of state to avoid it, or about allowing in-state retailers to deliver alcohol within the State. Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all. . . . If successful, Lebamoff's challenge would create a sizeable hole in the three-tier system.").

Because New Jersey's wholesaler purchase requirement is fundamental to the state's ability to ensure alcohol passes through each tier of its system, and because New Jersey's physical presence requirement is key to enforcing its system by keeping retailers within its investigators' jurisdiction, both challenged regulations are essential features of the three-tier system itself. As essential features, these regulations are

22

unquestionably legitimate and constitutional.

## III. CONCLUSION

For the reasons set forth above, we will affirm the District Court's summary judgment rulings.