**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2967
_____

JODI ASAY
*Appellant*

v.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.
AND/OR NEW JERSEY TRANSIT RAIL CORP.;
BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND
TRAINMEN; JAMES P. BROWN, Individually and in his
capacity as an Employee of NJ Transit Rail Operations, Inc.
or NJT Rail Corp.; DAVID DECKER, Individually and in his
capacity as an Employee of NJ Transit Rail Operations, Inc.
or NJT Rail Corp.; FRED MATTISON, Individually and in
his capacity as an Employee of NJ Transit Rail Operations,
Inc. or NJT Rail Corp.; ALAN ANTELL, Individually and in
his capacity as an Employee of NJ Transit Rail Operations,
Inc. or NJT Rail Corp.; DONALD BROSCHART,
Individually and in his capacity as an Employee of NJ Transit
Rail Operations, Inc. or NJT Rail Corp.; JOHN DOES 1–25,
said names being fictitious
_____

On Appeal from the United States District Court
for the District of New Jersey

(D.C. No. 2:19-cv-16503)
District Judge: Honorable Julien X. Neals
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 8, 2026

Before: HARDIMAN, BOVE and FISHER, Circuit Judges
(Filed: June 18, 2026 )

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Jodi Asay appeals a summary judgment in favor of her former employer, New Jersey Transit Rail Operations, Inc. (NJT), who she claims fired her in retaliation after she blew the whistle on NJT's unsafe practices. Because Asay failed to adduce evidence that anyone who influenced the decision to fire her knew about her protected activity, we will affirm.

I

Asay worked for NJT as a locomotive engineer from November 1999 to December 2017. In June 2014, Asay became concerned that NJT was not scheduling sufficient time between trips and causing employees to cut corners when inspecting the trains—a practice she calls "short turns." App. 110. Between June 2014 and October 2016, she reported her concern to several organizations including: her union, the Federal Railroad Administration, the New Jersey Department

of Transportation, and the office of the Governor of New Jersey. Then, in October 2016, following a fatal crash of an NJT train in Hoboken, she reported the alleged practice at a safety meeting between Liberty Mutual Insurance and NJT employees.

The record reveals very little about the Liberty Mutual meeting. Asay testified at her deposition that "[t]he company" knew she attended the meeting, but she did not identify any specific NJT employees. App. 117. She also referred to the meeting as "confidential" but didn't explain what that meant. *Id.* The three other NJT employees who were asked about the meeting at their depositions provided no more color. Alan Antell, then NJT's General Superintendent at New York Penn Station, testified that he did not recall attending the meeting, did not know who attended, and did not know what it was about. Fred Mattison, then a compliance officer for NJT, testified that he knew about the meeting but did not attend and did not know the identities of any NJT employees who attended until this litigation began. And Donald Broschart, then General Superintendent for NJT's Newark division, testified that he did not know about or participate in the meeting.

In November 2016, just over two weeks after the Liberty Mutual meeting, Asay operated a train at 70 miles per hour—50 miles per hour over the applicable speed limit. A hearing officer for NJT temporarily suspended her after taking evidence from Asay's representative and compliance officer Mattison at a disciplinary hearing. Someone acting on Superintendent Broschart's behalf signed off on the suspension decision. The suspension decision was later upheld by two different boards of review. Separately, Asay unsuccessfully petitioned for protection from discipline under NJT's peer-

3

review system, claiming that she had received contemporaneous permission from dispatch to operate the train above the speed limit.

In September of the following year, Asay operated a train through a stop signal. NJT conducted another disciplinary hearing and then fired Asay, though it is unclear who made the decision. The record does not identify the hearing officer. A signature purporting to be from Superintendent Antell appears on the notice of termination, but Antell testified that he was on vacation during the relevant period and did not sign the document, adjudicate Asay's disciplinary charge, or fire her. Antell also said that Assistant Superintendent Sheldon Booker would have been responsible for those duties in Antell's absence, but Booker testified that he does not remember adjudicating the charge and that he has never fired anyone.

A month or so after NJT's initial termination decision, a review board upheld it. After exhausting her administrative remedies, Asay sued NJT under the Federal Railroad Safety Act, alleging that NJT fired her in retaliation for reporting the company's short-turn practice. Following discovery, NJT moved for summary judgment, and the District Court granted the motion. Asay timely appealed.

II[1]

The Federal Railroad Safety Act prohibits railroad

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331 and 49 U.S.C. § 20109. We have jurisdiction under 28 U.S.C. § 1291. We review a summary judgment de novo, viewing the facts in the light most favorable to the nonmovant. *Jean-Paul Weg LLC v. Dir. of N.J. Div. of Alcoholic Beverage Control*,

4

carriers from retaliating against whistleblowers and provides a damages claim to employees who suffer such retaliation. 49 U.S.C. § 20109(a), (b), (e). The statute establishes a burden-shifting framework for resolving those claims. *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013). The plaintiff-employee must show, by a preponderance of the evidence, that her protected activity was a "contributing factor" in the employer's decision to take adverse action against her. *Id.* at 160; 49 U.S.C. §§ 20109(d)(2), 42121(b)(2)(B)(i). The burden then shifts to the employer to provide clear and convincing evidence that it would have taken the same action absent the employee's protected activity. *Araujo*, 708 F.3d at 160; 49 U.S.C. § 42121(b)(2)(B)(ii).

We have recognized that a plaintiff alleging retaliation under the FRSA must show that her "employer knew that she engaged in protected activity." *Araujo*, 708 F.3d at 157. Our cases under other employment statutes make similar observations. *See, e.g.*, *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196–97 (3d Cir. 2015); *Crosbie v. Highmark Inc.*, 47 F.4th 140, 145 (3d Cir. 2022); *see also Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) (same observation in First Amendment retaliation case). But those opinions make the further, and equally uncontroversial, observation that the plaintiff must show knowledge by someone who actually had a hand in the allegedly retaliatory act—not merely by the employer as an entity. *See Crosbie*, 47 F.4th at 145 ("an investigation's quality or timing can support an inference of pretext only *if those running the investigation*

---

133 F.4th 227, 232 (3d Cir. 2025). We will affirm if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.*

know of the protected activity" (emphasis added)); *Daniels*, 776 F.3d at 196 (holding there can be no "causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.").

That principle applies equally under the FRSA: the plaintiff must show knowledge of the protected activity by an agent of the employer *who influenced the adverse decision*. Otherwise, that activity could not possibly have been a "contributing factor" in her firing. 49 U.S.C. § 42121(b)(2)(B)(i); *see Araujo*, 708 F.3d at 158 ("a contributing factor is any factor . . . [that] tends to affect in any way the outcome of the decision."). So Asay is wrong to argue that she may point to knowledge by "*any* [NJT] supervisor or manager." Asay Br. 16 (emphasis added).

Asay did not adduce evidence that anyone at NJT who had a hand in her firing knew that she reported NJT's alleged short-turn practice to Liberty Mutual. Each of the three NJT employees who were arguably involved in Asay's disciplinary processes and deposed in discovery testified that they had no role in the safety meeting with Liberty Mutual and did not know the identity of any NJT employees who participated. And none of the evidence Asay cited in response could lead a juror to infer that they, or anyone else involved in her discipline, did know. The temporal proximity between her report to Liberty Mutual and her first disciplinary charge does not suffice because the mere fact that two events occurred close in time does not, on its own, suggest that anyone involved in the latter event knew of the former one. *Daniels*, 776 F.3d at 197. Nor does it suffice that Liberty Mutual shared the information it learned during the forum with *someone* at NJT, because nothing in the record shows that the information made its way

6

to anyone who influenced the decision to fire her.

*     *     *

For the stated reasons, we will affirm.


David P. Schroth, I
DESTRIBATS CAMPBELL STAUB & SCHROTH

*Counsel for Appellant*

Richard K. Hohn
John A. Thiry
HOHN & SCHEUERLE

*Counsel for Appellees*